KATHERINE E. KONSCHNIK
Acting Assistant Attorney General
Environment and Natural Resources Division

JS-6

ANGELA MO (Cal. Bar No. 262113)
Email: angela.mo@usdoj.gov
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
Telephone: (202) 514-1707
*Attorneys for Plaintiff the United States of America*

(Additional Attorneys Listed on Following Page)

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, the CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL, and the TOXIC SUBSTANCES CONTROL ACCOUNT, <br><br> Plaintiffs, <br><br> v. <br><br> Honeywell International Inc.; HD Development of Maryland, Inc.; Kaiser Foundation Health Plan, Inc.; and PSA Institutional Partners, L.P., <br><br> Defendants. | Case No. 2:24-cv-08378-MCS-AGR <br><br> **CONSENT DECREE** |

ROB BONTA
Attorney General of California
VANESSA MORRISON (Cal. Bar No. 254002)
Supervising Deputy Attorney General
MADISON LANE (Cal. Bar No. 348156)
Deputy Attorney General
California Department of Justice
600 West Broadway, Suite 1800,
San Diego, CA 92101
300 South Spring Street,
Los Angeles, CA 90013
Email: Madison.Lane@doj.ca.gov
Phone: (619) 321-5775

*Attorneys for Plaintiffs the California Department of Toxic Substances Control and
the Toxic Substances Control Account*

John Heintz (Cal. Bar No. 258375)
john.heintz@lw.com
Cody Kermanian (Cal. Bar No. 324255)
cody.kermanian@lw.com
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071-1560
Phone: +1.213.891.7395

Gene Lucero (Cal. Bar No. 60252)
genelucero213@gmail.com
1462 Claridge Dr
Beverly Hills, CA 90210-2265
Phone: +1.310.278.3585

*Attorneys for Honeywell International Inc.*

Cordon Baesel (Cal. Bar No. 149132)
cordon.baesel@troutman.com
11682 El Camino Real, Suite 400
San Diego, CA 92130
Phone: +1.858.509.6079

*Attorney for HD Development of Maryland, Inc.*

John F. Cermak Jr. (Cal. Bar No. 146799)
jcermak@cermaklegal.com
12121 Wilshire Blvd., Suite 322
Los Angeles, CA 90025
Phone: +1.424.465.1531

*Attorney for Kaiser Foundation Health Plan, Inc.*

Dana P. Palmer (Cal Bar No. 232571)
dpalmer@allenmatkins.com
1901 Avenue of the Stars, Suite 1800,
Los Angeles, CA 90067
Phone: +1.310.788.2444

*Attorney for PSA Institutional Partners, L.P.*

1

2

3

**TABLE OF CONTENTS**

I.      BACKGROUND ...................................................................................1
II.     JURISDICTION AND VENUE ........................................................17
III.    PARTIES BOUND ..............................................................................17
IV.     DEFINITIONS ....................................................................................18
V.      OBJECTIVES .....................................................................................27
VI.     PERFORMANCE OF THE WORK ..................................................27
VII.    PROPERTY REQUIREMENTS .......................................................31
VIII.   FINANCIAL ASSURANCE ..............................................................35
IX.     INDEMNIFICATION AND INSURANCE .......................................41
X.      OBLIGATIONS OF SETTLING CASH DEFENDANTS ..............43
XI.     PAYMENTS FOR RESPONSE COSTS ...........................................43
XII.    DISBURSEMENT OF SPECIAL ACCOUNT FUNDS ..................47
XIII.   FORCE MAJEURE .............................................................................52
XIV.    DISPUTE RESOLUTION ..................................................................54
XV.     STIPULATED PENALTIES ..............................................................57
XVI.    COVENANTS BY PLAINTIFFS ......................................................62
XVII.   COVENANTS BY SETTLING DEFENDANTS ...............................65
XVIII.  EFFECT OF SETTLEMENT; CONTRIBUTION ...........................66
XIX.    RECORDS ...........................................................................................68
XX.     NOTICES AND SUBMISSIONS ......................................................71
XXI.    APPENDIXES .....................................................................................73
XXII.   MODIFICATIONS TO DECREE ......................................................73
XXIII.  SIGNATORIES ...................................................................................74
XXIV.   PRE-ENTRY PROVISIONS ..............................................................74
XXV.    INTEGRATION ..................................................................................74
XXVI.   FINAL JUDGMENT ..........................................................................75

iv

# I.    BACKGROUND

1.    WHEREAS, the United States of America ("United States"), on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"), filed a complaint in this matter under sections 106 and 107 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA").

2.    WHEREAS, the United States in its complaint seeks, *inter alia*: (1) reimbursement of costs incurred by EPA and the Department of Justice ("DOJ") for response actions at the North Hollywood Operable Unit of the San Fernando Valley Area 1 Superfund Site ("NHOU") in Los Angeles, California, together with accrued interest; and (2) performance by the defendants of a response action at the NHOU consistent with the National Contingency Plan, 40 C.F.R. part 300 ("NCP").

3.    WHEREAS, in accordance with the NCP and section 121(f)(1)(F) of CERCLA, EPA notified the State of California ("State") on September 28, 2021, of negotiations with potentially responsible parties ("PRPs") regarding the implementation of the remedial design and remedial action for the NHOU, and EPA has provided the State with an opportunity to participate in such negotiations and to be a party to this Consent Decree ("Decree").

4.    WHEREAS, the State of California Department of Toxic Substances Control and the Toxic Substances Control Account ("DTSC") has also filed a complaint against the defendants in this Court alleging that the defendants are liable to the State under section 107 of CERCLA, and under Sections 78660 and 79650 of the California Health and Safety Code for: (1) reimbursement of certain costs that DTSC has incurred at the NHOU, together with accrued interest; and (2) performance of certain response actions by the defendants at the NHOU consistent with the NCP.

1

5.      WHEREAS, in accordance with section 122(j)(1) of CERCLA, EPA notified the National Oceanic and Atmospheric Administration, United States Fish and Wildlife Service, and the California Natural Resources Agency on December 5, 2023, of negotiations with PRPs regarding the release of hazardous substances that may have resulted in injury to the natural resources under federal trusteeship and encouraged the trustee(s) to participate in the negotiation of this Decree.

6.      WHEREAS, the defendants that have entered into this Decree ("Settling Defendants") do not admit any liability to Plaintiffs arising out of the transactions or occurrences alleged in the complaints, nor do they acknowledge that the release or threatened release of hazardous substance(s) at or from the NHOU constitutes an imminent and substantial endangerment to the public health or welfare or the environment.

7.      WHEREAS, the San Fernando Valley groundwater basin (the "Basin") is an important source of drinking water for the Los Angeles metropolitan area. The Los Angeles Department of Water and Power ("LADWP") produces groundwater for public distribution from seven well fields in the Basin that are located near or within the NHOU. Over the past fifteen years, groundwater from LADWP well fields located in the Basin, including in the NHOU, has contributed approximately eleven percent of the City of Los Angeles' municipal water supply.

8.      WHEREAS, in 1980, volatile organic compounds ("VOCs"), including the industrial solvents trichloroethylene ("TCE") and perchloroethylene ("PCE"), were discovered in approximately one-fourth of LADWP's production wells located in the Basin. In response to these findings, LADWP and the Southern California Association of Governments, using EPA funds, began a groundwater study in 1981 to determine the extent and severity of the contamination and to develop remediation strategies. The two-year study included field investigations and the analyses of more than 600 samples. In addition to confirming that TCE and

2

PCE had already impacted LADWP drinking water production wells, the groundwater study indicated that contamination was spreading rapidly.

9.      WHEREAS, in 1985, EPA concluded that sufficient hydrologic data existed to justify a fast-track action to address groundwater contamination impacting the North Hollywood well field, and in March of 1986, a cooperative agreement was signed by EPA and LADWP, authorizing LADWP to perform a feasibility study to identify options for addressing the contamination. LADWP completed a feasibility study for the NHOU in November 1986 ("NHOU Feasibility Study").

10.      WHEREAS, in 1986, in accordance with section 105 of CERCLA, EPA listed four sites in the Basin on the Superfund National Priorities List ("NPL"), set forth at 40 C.F.R. part 300, Appendix B, by publication in the Federal Register in June 1986, 51 Fed. Reg. 21054 ("SFV Sites"). The SFV Sites are (1) the San Fernando Valley Area 1 Superfund Site ("Area 1 Site"), which consists of the NHOU and the Burbank Operable Unit ("BOU"); (2) the San Fernando Valley Area 2 Superfund Site, which consists of the Glendale North, the Glendale South, and the Glendale Chromium Operable Units; (3) the San Fernando Valley Area 3 Site, also known as Verdugo, which was delisted from the NPL by EPA in 2004; and (4) the San Fernando Valley Area 4 Site, also known as Pollock.

11.      WHEREAS, in September 1987, EPA finalized the first Record of Decision ("ROD") for the NHOU, selecting an interim remedy to contain the groundwater contamination and remove contaminant mass ("NHOU1IR"). The State had a reasonable opportunity to review and comment on the NHOU1IR ROD and it concurred on EPA's remedy selection. The NHOU1IR ROD includes a summary of responses to the public comments received on the NHOU Feasibility Study.

12.      WHEREAS, the NHOU1IR controlled the movement of groundwater using a series of extraction wells that pumped contaminated groundwater out of the

Basin. Eight NHOU1IR extraction wells were installed in an L-shaped configuration. Wells NHE-1 through NHE-6 extended southeasterly for approximately one mile, beginning near the former Bendix Aviation facility located on assessor's parcel number ("APN") 2320-001-030, APN 2320-001-036, APN 2320-001-041, and APN 2320-001-042 in Los Angeles, CA ("Bendix Facility"). The remaining two extraction wells, NHE-7 and NHE-8, extended due east from NHE-6 for approximately one mile ("Eastern NHOU Wells"). See Figure 1.

13.     WHEREAS, after the contaminated groundwater water was extracted from the Basin by the NHOU1IR wells, it was piped to a treatment plant, located on property owned by LADWP on Vose Street ("NHOU Treatment Plant"), where LADWP, which operated the NHOU1IR, including the extraction wells and the NHOU Treatment Plant, treated the water using an air stripper and dry phase granular activated carbon. After being extracted and treated by the NHOU1IR, the water next went to an LADWP blending station where LADWP treated it further, blended it with water from other sources, and distributed it through the water supply system for the City of Los Angeles. The NHOU1IR began operation in 1989, and LADWP continued to operate the NHOU Treatment Plant and many of the extraction wells until November 2017, when the system was shut down in preparation for construction of a second interim remedy for the NHOU.

14.     WHEREAS, three of the primary source areas for contaminants in the NHOU groundwater are (1) the Bendix Facility, owned by a predecessor to Honeywell International Inc. ("Settling Work Defendant"); (2) the former aircraft manufacturing facility that was owned by Lockheed Martin Corporation ("Lockheed Martin") at what is now the Hollywood Burbank Airport, located on APN 2466-019-904, and portions of APNs 2466-019-902 and 2466-011-902; and (3) the former Hewitt Pit landfill, located on APN 2307-022-010 ("Hewitt Pit

Landfill"), that was formerly owned by CalMat Co., d/b/a Vulcan Materials
Company, Western Division ("CalMat").

15.    WHEREAS, EPA and LADWP began a remedial investigation
throughout the Basin, including the four SFV Sites, in March 1988 ("Basin-Wide
Remedial Investigation").  LADWP completed a Basin-Wide Remedial
Investigation study in December 1992. The Basin-Wide Remedial Investigation
continues, and includes ongoing groundwater monitoring, mapping, and
management of a San Fernando Valley Basin-Wide groundwater sampling
database.

16.    WHEREAS, in 1996 and 1997 the United States entered into two
separate consent decrees with thirty-seven PRPs that agreed to (1) reimburse the
United States for past response costs at the NHOU and a proportional share of the
costs associated with the Basin-Wide Remedial Investigation; and (2) pay future
costs for the operation and maintenance of the NHOU1IR for its anticipated 15-
year term (1989-2004). EPA deposited the payment received from the signatories
to the 1996 and 1997 consent decrees ("NHOU1IR CD Signatories") into a special
account (the "NHOU Special Account") where the funds were set aside to conduct
or finance the response actions in the Basin. EPA used the funds in the NHOU
Special Account primarily to reimburse LADWP, pursuant to a cooperative
agreement, for the costs LADWP incurred operating and maintaining the
NHOU1IR.

17.    WHEREAS, the settlement funds that EPA collected pursuant to the
1996 and 1997 consent decrees, including accrued interest, funded operation of the
NHOU1IR until the fall of 2008. In order to continue operation and maintenance of
the NHOU1IR until a second interim remedy could be implemented, EPA entered
an Administrative Settlement Agreement for Recovery of Response Costs in
August 2008 ("2008 Interim Funding AOC") with four of the NHOU1IR CD
Signatories, U.S. EPA Region IX CERCLA Docket No. 9-2008-0024. The

5

signatories to the 2008 Interim Funding AOC agreed to pay $1,300,920 into the NHOU Special Account to finance operation and maintenance of the extraction wells and the NHOU Treatment Plant for approximately three additional years.

18.     WHEREAS, in September 2008, EPA issued a unilateral administrative order, U.S. EPA Region IX CERCLA Docket No. 9-2008-0025 (the "Interim Funding UAO"), to seven of the NHOU1IR CD Signatories that declined to participate in the 2008 Interim Funding AOC.  The Interim Funding UAO directed respondents to either (1) provide funding to ensure continued operation of the NHOU1IR, or (2) contain and prevent the migration of the contaminated groundwater in the NHOU in a manner that is at least as effective as the level of containment provided by the NHOU1IR. The respondents chose the first option and paid $399,895, which was directed into the NHOU Special Account.

19.     WHEREAS, in response to changing groundwater conditions, the discovery of VOC contamination in new areas of the aquifer, and the emergence of new contaminants of concern, including hexavalent chromium and 1,4-dioxane, EPA completed a focused feasibility study for the NHOU in July 2009 ("2009 NHOU FFS").

20.     WHEREAS, in accordance with section 117 of CERCLA and 40 C.F.R. § 300.430(f), EPA published notice of the completion of the 2009 NHOU FFS and of a proposed plan for remedial action on July 8, 2009, in a major local newspaper of general circulation. EPA held a public meeting on July 21, 2009, and provided the public with an opportunity for written and oral comments on the proposed plan. A copy of the transcript of the public meeting and comments received are available to the public as part of the administrative record for the NHOU.

21.     WHEREAS, EPA finalized a ROD on September 30, 2009 ("2009 ROD"), in which it selected a second interim remedy for the NHOU ("NHOU2IR"). EPA provided the State with a reasonable opportunity to review

6

and comment on the 2009 ROD and the State concurred on EPA's remedy selection. The 2009 ROD includes a summary of responses to comments received from the public.

22.    WHEREAS, like the NHOU1IR, the remedy selected in the 2009 ROD relies on groundwater extraction wells to contain the contaminated groundwater plume and remove contaminant mass. It also relies on a treatment system for VOCs and, as an end use, delivers treated water to LADWP for use in its domestic water supply system. It differs from the NHOU1IR in that it treats 1,4-dioxane and hexavalent chromium, calls for groundwater data collection to support a final NHOU remedy, and selects, as an institutional control, information sharing between EPA and LADWP to ensure that groundwater pumping for drinking water production by LADWP does not interfere with the success of the remedy.

23.    WHEREAS, the remedial action objectives ("RAOs") for the NHOU2IR are: (1) prevent exposure to contaminated groundwater, above acceptable risk levels; (2) contain areas of contaminated groundwater that exceed the Maximum Contaminant Levels ("MCLs") and notification levels ("NLs") to the maximum extent practicable; (3) prevent further degradation of water quality at the Rinaldi-Toluca and North Hollywood West production wells by preventing the migration toward these well fields of the more highly contaminated areas of the VOC plume located to the east/southeast; (4) achieve improved hydraulic containment to inhibit horizontal and vertical contaminant migration in groundwater from the more highly contaminated areas and depths of the aquifer to the less contaminated areas and depths of the aquifer, including the southeast portion of the NHOU in the vicinity of the Erwin and Whitnall production well fields; and, (5) remove contaminant mass from the aquifer.

24.    WHEREAS, the 2009 NHOU FFS and 2009 ROD identify the contamination that is targeted for containment by the NHOU2IR ("NHOU Targeted Contamination"). The NHOU Targeted Contamination includes the

contaminants of concern ("COCs") present in the Basin groundwater above performance standards identified in Table 6 of the 2009 ROD and Table 2 of the 2014 amendment to the 2009 ROD. The NHOU Targeted Contamination, as modelled in 2008, is depicted in Figure 2 and Figure 3. The NHOU Targeted Contamination, as modelled in 2021, is depicted in Figure 4.

25.    WHEREAS, on December 29, 2009, EPA finalized an Administrative Settlement Agreement and Order on Consent for Remedial Investigation ("2009 RI AOC") with Settling Work Defendant, U.S. EPA Region IX CERCLA Docket No. 9-2010-03. In the 2009 RI AOC, Settling Work Defendant agreed to install and sample approximately thirty-five additional monitoring wells in the NHOU. According to Settling Work Defendant, it spent approximately $6.7 million to install these wells and sample them in four subsequent annual events.

26.    WHEREAS, in 2010, EPA sent special notice to twenty-one parties associated with eleven facilities that EPA determined had contributed to the groundwater contamination in the NHOU. In 2011, after the recipients of special notice failed to present EPA with a good-faith offer to implement the NHOU2IR, EPA entered into an Administrative Settlement Agreement and Order on Consent for Remedial Design, U.S. EPA Region IX CERCLA Docket No. 2011-01, with Settling Work Defendant and Lockheed Martin for the design of the NHOU2IR ("2011 RD AOC").

27.    WHEREAS, at the time EPA finalized the 2009 ROD, LADWP was developing long-term plans for use of groundwater from the Basin in its drinking water supply, and it was not prepared to commit to a specific role in the implementation of the remedy as contemplated in the 2009 ROD. LADWP would not commit to accepting all of the treated water or to limiting its groundwater pumping to avoid interference with the NHOU2IR's containment objectives. In response to the uncertainty surrounding LADWP's role in remedy implementation,

8

EPA amended the 2009 ROD in 2014 to add re-injection of the treated water as an alternate end use ("2014 RODA").

28.     WHEREAS, negotiations between EPA, certain PRPs, and LADWP regarding implementation of the NHOU2IR continued for years. In order to secure funding to continue operating the NHOU1IR during those extended negotiations, EPA twice amended the 2008 Interim Funding AOC. In 2013, pursuant to the First Amendment to the Settlement Agreement for Recovery of Response Costs, EPA CERCLA Docket No. 9-2013-008, Settling Work Defendant and Lockheed Martin agreed to pay $1,491,000 into the NHOU Special Account in order to fund operation and maintenance of the NHOU1IR for two and a half years. In 2015, pursuant to the Second Amendment to the Settlement Agreement for Recovery of Response Costs, U.S. EPA Region IX CERCLA Docket No. 9-2015-0012, Honeywell and Lockheed Martin agreed to pay $560,000 into the NHOU Special Account in order to fund operation and maintenance of the NHOU1IR for one additional year.

29.     WHEREAS, in 2016, EPA drafted a "Memorandum to File" that discusses sampling data collected since the 2009 ROD and explains the need to design and install extraction wells in the vicinity of the Hewitt Pit Landfill to protect the North Hollywood West wellfield, as contemplated in the 2009 ROD ("2016 Memorandum to File").

30.     WHEREAS, on July 31, 2017, EPA and CalMat finalized an Administrative Settlement Agreement and Order on Consent for Remedial Design, U.S. EPA Region IX CERCLA Docket No. 2017-05 ("2017 CalMat AOC"). In the 2017 CalMat AOC, CalMat agreed to perform a pre-design investigation and design an extraction and treatment system to (1) capture contaminated groundwater that is emanating from the former Hewitt Pit Landfill and (2) prevent further impacts to LADWP's North Hollywood West wellfield, located to the west of the Bendix Facility.

9

31.     WHEREAS, in or around 2017, Settling Work Defendant and
Lockheed Martin, which had been working together on design of the NHOU2IR
pursuant to the 2011 RD AOC, proposed to EPA that, going forward, they would
complete the entire design of the remedy selected in the 2009 ROD, but each
would assume responsibility for the design and implementation of distinct portions
of the NHOU2IR. Under their proposed approach, Settling Work Defendant would
assume responsibility for designing and implementing the portion of the
NHOU2IR that addresses the NHOU Targeted Contamination in the vicinity of
NHE-1 through NHE-6 ("Central NHOU Targeted Contamination") while
Lockheed Martin would assume responsibility for addressing contamination
extracted from the Eastern NHOU Wells.

32.     WHEREAS, on October 26, 2017, EPA issued Settling Work
Defendant a unilateral administrative order under Section 106(a) of CERCLA, 42
USC § 9606(a), U.S. EPA Region IX CERCLA Docket No. 2017-06 ("2017
Honeywell UAO"). The 2017 Honeywell UAO directs Honeywell to construct
portions of the NHOU2IR, designed pursuant to the 2011 RD AOC, that address
the Central NHOU Targeted Contamination and complete remedy startup and
shakedown operations for the upgraded NHOU Treatment Plant. Specifically, the
2017 Honeywell UAO requires Settling Work Defendant to construct new wells to
replace NHOU1IR extraction wells NHE-2, NHE-3, NHE-4, NHE-5, and NHE-6
("Central NHOU Wells") and construct a treatment system capable of removing
volatile organic compounds, 1,4-dioxane, and hexavalent chromium from the
extracted groundwater.

33.     WHEREAS, on February 7, 2018, EPA finalized an Administrative
Settlement Agreement and Order on Consent for the Recovery of Response Costs,
U.S. EPA Region IX CERCLA Docket No. 2017-07, with Settling Work
Defendant for recovery of costs incurred by EPA overseeing implementation of the
work ordered in the 2017 Honeywell UAO.

34.     WHEREAS, ongoing review of groundwater data and evaluation of LADWP's evolving groundwater pumping plans led EPA to conclude that increasing the number of extraction wells and the volume of water extracted in the NHOU would more effectively meet the RAOs in the 2009 ROD. After LADWP pledged to cooperate with a modified approach to the remedy that expanded the capture zone and increased the volume of water to be treated, EPA finalized an Explanation of Significant Differences in February 2018 ("2018 ESD").

35.     WHEREAS, the 2018 ESD modified the 2009 ROD to: (1) to improve hydraulic containment and treatment of the plume by adding additional extraction wells; (2) expand the capacity of the groundwater treatment system in order to accommodate the additional volume of water extracted; and (3) divert water extracted from the Eastern NHOU Wells, and the additional extraction wells installed in their vicinity, to the treatment plant for the BOU, located on Monterey Avenue ("BOU Treatment Plant"). The "additional extraction wells" called for in the 2018 ESD are comprised of at least two wells in the vicinity of the Eastern NHOU Wells (together, the two wells are referred to as the "Eastern ESD Wells") and up to five wells in the vicinity of the Central NHOU Wells (together, the five wells are referred to as the "Central ESD Wells").

36.     WHEREAS, EPA decided to divert the water extracted from the Eastern ESD Wells and the Eastern NHOU Wells (together, the "Eastern NHOU Expanded Well Network") to the BOU Treatment Plant because the BOU Treatment Plant is physically closer to those wells than the NHOU Treatment Plant and the BOU Treatment Plant has the capacity and treatment technology to accept the water. Lockheed supported the decision to divert the water from the Eastern NHOU Expanded Well Network to the BOU, and the City of Burbank, which operates the BOU Treatment Plant pursuant to a 2000 consent decree, agreed to accept and treat the water.

37.    WHEREAS, on June 8, 2018, EPA issued Lockheed Martin a unilateral administrative order under Section 106(a) of CERCLA, 42 USC § 9606(a), U.S. EPA Region IX CERCLA Docket No. 2018-12 ("2018 Lockheed UAO"). The 2018 Lockheed UAO directs Lockheed Martin to: (1) design and construct the Eastern NHOU Expanded Well Network; (2) design and construct the piping infrastructure necessary to convey water extracted by the Eastern NHOU Expanded Well Network to the BOU Treatment Plant; (3) operate the Eastern NHOU Expanded Well Network and convey all extracted water to the BOU Treatment Plant; (4) treat all water extracted at the Eastern NHOU Expanded Well Network to meet the applicable or relevant and appropriate requirements for the NHOU2IR as well as any off-site requirements necessary for the end use ultimately selected by EPA; and (5) provide an end use for all water extracted by the Eastern NHOU Expanded Well Network.

38.    WHEREAS, on July 23, 2018, EPA finalized an Administrative Settlement Agreement and Order on Consent for the Recovery of Response Costs, U.S. EPA Region IX CERCLA Docket No. 2018-13, with Lockheed Martin for recovery of costs incurred by EPA overseeing implementation of the work ordered in the 2018 Lockheed UAO.

39.    WHEREAS, when the Work required under the 2017 Honeywell UAO and the 2018 Lockheed UAO is implemented, all water treated at the NHOU Treatment Plant will be extracted by the Central NHOU Wells and the Central ESD Wells. None of the water extracted by the Eastern NHOU Expanded Well Network will be treated at the NHOU Treatment Plant.

40.    WHEREAS, in 2019, EPA amended the 2017 Honeywell UAO, U.S. EPA Region IX CERCLA Docket No. 2019-12 ("2019 Amended Honeywell UAO"), directing Settling Work Defendant to: (1) design three of the Central ESD Wells; (2) design the piping infrastructure necessary to convey the water from the Central NHOU Wells and the three Central ESD Wells included in the design

12

(together, the "Central NHOU Expanded Well Network") to the NHOU Treatment Plant; (2) abandon well NHE-1 and remove it from the extraction well network; (3) with the exception of wells NHE-2 and NHE-6, which did not require replacement at the time, and wells NHE-7 and NHE-8, which Lockheed Martin will address pursuant to the 2018 Lockheed UAO, construct the remedy designed pursuant to the 2011 RD AOC; (4) complete construction of the Central NHOU Expanded Well Network and the piping infrastructure necessary to convey the water from those wells to the NHOU Treatment Plant; and (5) complete remedy startup and shakedown operations.

41.     WHEREAS, modeling submitted in support of the Remedial Design for the NHOU2IR by Settling Work Defendant pursuant to the 2011 RD AOC, the 2017 Honeywell UAO, and the 2019 Amended Honeywell UAO includes a designed capture area that demonstrates that the Central NHOU Expanded Well Network, in conjunction with LADWP's Rinaldi Toluca Well Field ("RT Wells") (See Figure 5) and North Hollywood West Well Field ("NHW Wells") (See Figure 5), is capable of containing the Central NHOU Targeted Contamination consistent with the NHOU2IR's remedial action objectives.

42.     WHEREAS, although work to implement specific portions of the NHOU2IR is being performed by different parties pursuant different enforcement instruments, this Decree, the 2017 Honeywell UAO, the 2019 Amended Honeywell UAO, and the 2018 Lockheed UAO do not define the scope of any party's liability for contamination in the NHOU or the Basin.

43.     WHEREAS, the NHOU2IR allows for either the reinjection of treated water or the delivery of treated water to LADWP for its use as drinking water supply. The 2009 NHOU FFS projects the cost of the reinjection end use to be approximately $134 million and the cost of the drinking water end use to be approximately $108 million. The cost differential between the alternative end uses is largely attributable to additional infrastructure necessary to re-inject the treated

water. The drinking water end use is expected to conserve energy and reduce costs for LADWP's drinking water production operations because the treated water, if reinjected back into the Basin, must be pumped out of the Basin again before it can be used.

44.    WHEREAS, LADWP owns the real property where the NHOU Treatment Plant is located (the "Lankershim Yard") and it owns the right of ways on which the Central NHOU Expanded Well Network is located. The Lankershim Yard has sufficient space to accommodate the upgrades and expansion to the NHOU Treatment Plant required for the NHOU2IR.

45.    WHEREAS, Settling Work Defendant submitted remedial design documents to EPA for a drinking water end use. The 2009 ROD, as modified, does not require that the treated water meet all drinking water standards. Before the water treated at the NHOU Treatment Plant is served as drinking water, drinking water regulations require LADWP to take additional steps, including treating the water for contaminants that are not part of the NHOU2IR. The additional steps required before the extracted water can be served as drinking water do not occur at the NHOU Treatment Plant and are not part of the NHOU2IR.

46.    WHEREAS, public entities covered by the Safe Drinking Water Act, California Public Utilities Code, California Government Code, and California case law have broad protections from tort liability related to the provision of drinking water (see Cal. Pub. Util. Code § 1759; Cal. Gov. Code §§ 815-818.9 ["[e]xcept as otherwise provided by statute ... [a] public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person."]). While LADWP is a public entity with such protections, Settling Work Defendant is not.

47.    WHEREAS, in 2014, Settling Work Defendant began negotiating an agreement with LADWP in an effort to implement the NHOU2IR with a drinking water end use while minimizing its exposure to liability for claims related to

14

service of drinking water. Following lengthy consultations and coordination with EPA, Settling Work Defendant entered into a settlement agreement with LADWP in December 2019 ("Honeywell/LADWP Settlement Agreement"). Pursuant to the Honeywell/LADWP Settlement Agreement, LADWP will operate the Central NHOU Expanded Well Network, the NHOU Treatment Plant, and the piping and conveyance infrastructure necessary to transport water from the Central NHOU Expanded Well Network to the NHOU Treatment Plant ("Central NHOU Extraction and Treatment System"), and route the treated water to its municipal drinking water supply infrastructure, where LADWP will take the necessary steps to serve it as drinking water.

48.    WHEREAS, in order to effectuate the Honeywell/LADWP Settlement Agreement, Settling Work Defendant negotiated a 50-year license with LADWP to provide Settling Work Defendant and its sub-licensees (which includes EPA) with access to 27 properties owned or controlled by LADWP (the "Honeywell/LADWP License Agreement") to facilitate the Work. Prior to executing the Honeywell/LADWP License Agreement, Settling Work Defendant provided EPA with an opportunity to review and comment on the Honeywell/LADWP License Agreement. Pursuant to the Charter of the City of Los Angeles, approval of the Los Angeles City Council was required in order for the Honeywell/LADWP License Agreement to become effective. In February 2020, Settling Work Defendant obtained such approval from the Los Angeles City Council and, on March 3, 2020, the Mayor of the City of Los Angeles approved the Honeywell/LADWP License Agreement. Based on circumstances and conditions currently known, EPA and Honeywell anticipate that the Honeywell/LADWP License Agreement will provide the access necessary to implement the Work as contemplated in this Decree.

49.    WHEREAS, the Honeywell/LADWP Settlement Agreement does not alter Settling Work Defendant's obligation to the United States under this Decree

1  and it does not transfer any of Settling Work Defendant's liability under 42 USC §

2  9601 et seq. to LADWP or any other party.

3      50.    WHEREAS, on December 4, 2019, EPA finalized an Administrative

4  Settlement Agreement for the Recovery of Past Response Costs, U.S. EPA Region

5  IX CERCLA Docket No. 2020-02, with Settling Work Defendant ("2019

6  Honeywell Cost Recovery AOC"). Pursuant to the 2019 Honeywell Cost Recovery

7  AOC, Settling Work Defendant paid $11,600,000 of costs incurred by EPA at the

8  NHOU through September 2019, including $2,100,000 of costs related to the

9  NHOU's proportional share of the Basin-Wide Remedial Investigation.

10      51.    WHEREAS, this Decree includes a disbursement special account and

11  limits EPA's obligation to disburse funds to those received from Settling Cash

12  Defendants that are signatories to this Decree. If EPA amends this Decree in the

13  future and adds Settling Cash Defendants that have not entered into settlements

14  with Settling Work Defendant, EPA may, but is not obligated to, consider

15  depositing some portion of the funds collected from such Settling Cash Defendants

16  into the Disbursement Special Account.

17      52.    WHEREAS, based on the information currently available, EPA and

18  the State have determined that the Work will be properly and promptly conducted

19  by Settling Work Defendant if conducted in accordance with this Decree.

20      53.    WHEREAS, the Parties recognize, and the Court by entering this

21  Decree finds, that this Decree has been negotiated by the Parties in good faith, that

22  implementation of this Decree will expedite the cleanup of the NHOU and will

23  avoid prolonged and complicated litigation between the Parties, and that this

24  Decree is fair, reasonable, in the public interest, and consistent with CERCLA.

25

26

27

28

16

NOW, THEREFORE, it is hereby **ORDERED** and **DECREED** as follows:

## II.    JURISDICTION AND VENUE

54.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331, 1367, and 1345, and sections 106, 107 and 113(b) of CERCLA, and personal jurisdiction over the Parties. Venue lies in this District under section 113(b) of CERCLA and 28 U.S.C. §§ 1391(b), and 1395(a), because the Area 1 Site is located in this judicial district. This Court retains jurisdiction over the subject matter of this action and over the Parties for the purpose of resolving disputes arising under this Decree, entering orders modifying this Decree, or effectuating or enforcing compliance with this Decree. Settling Defendants may not challenge the terms of this Decree or this Court's jurisdiction to enter and enforce this Decree.

## III.    PARTIES BOUND

55.    This Decree is binding upon the United States and DTSC and upon Settling Defendants and their successors. Unless the United States otherwise consents, (a) any change in ownership or corporate or other legal status of any Settling Defendant, including any transfer of assets, or (b) any Transfer of the Area 1 Site or any portion thereof, does not alter any of Settling Defendants' obligations under this Decree. Settling Defendants' responsibilities under this Decree cannot be assigned except under a modification executed in accordance with ¶ 136.

56.    In any action to enforce this Decree, Settling Defendants may not raise as a defense the failure of any of their officers, directors, employees, agents, contractors, subcontractors, or any person representing Settling Defendants or of any entity that is operating and/or maintaining the Central NHOU Extraction and Treatment System to take any action necessary to comply with this Decree. Settling Defendants shall provide notice of this Decree to each person representing Settling Defendants with respect to the Site or the Work. Settling Defendants shall provide notice of this Decree to each contractor performing any Work and shall

ensure that notice of the Decree is provided to each subcontractor performing any
Work.

## IV.  DEFINITIONS

57.    Subject to the next sentence, terms used in this Decree that are defined
in CERCLA or the regulations promulgated under CERCLA have the meanings
assigned to them in CERCLA and the regulations promulgated under CERCLA.
Whenever the terms set forth below are used in this Decree, the following
definitions apply:

"2009 ROD" means the Interim Action Record of Decision for the North
Hollywood Operable Unit of the San Fernando Valley Area 1 Superfund Site,
dated September 30, 2009, and all attachments thereto. Attached as Appendix A.

"2014 RODA" means EPA's January 10, 2014 Amendment to the 2009
Interim Action Record of Decision for the North Hollywood Operable Unit of the
San Fernando Valley Area 1 Superfund Site, and all attachments thereto.  Attached
as Appendix A.

"2016 Memo to File" means EPA's June 20, 2016 Memorandum to File
regarding the *Addition of Groundwater Extraction Wells West of Hewitt Pit to the
NHOU Second Interim Remedy*, and all attachments thereto. Attached as Appendix
A.

"2018 ESD" means EPA's February 27, 2018 Explanation of Significant
Differences to the 2009 Interim Action Record of Decision, and all attachments
thereto. Attached as Appendix A.

"Area 1 Site" or "Site" means the San Fernando Valley Area 1 Superfund
Site, located along the border of the City of Los Angeles and the City of Burbank,
California, and depicted generally on the map attached as Figure 1.  The Area 1
Site includes both the NHOU and the BOU.

"Basin-Wide Cost Allocation" shall mean the proportionate share of all
Basin-Wide Remedial Investigation Costs allocated to the SFV Sites and their

operable units.  The Basin-Wide Cost Allocation is calculated by dividing the
designed pumping rate for a remedial action implemented at one of the SFV Sites
or an operable unit at one of the SFV Sites by the total designed pumping rate for
all remedial actions implemented at the SFV Sites.

"Basin-Wide Remedial Investigation Costs" shall mean all costs incurred by
EPA or DOJ on behalf of EPA related to coordination and continuation of
groundwater monitoring programs at the SFV Sites as part of the Basin-Wide
Remedial Investigation. Basin-Wide Remedial Investigation Costs include but are
not limited to: (a) database licensing; (b) data management, data requests, and data
access; (c) coordination with responsible parties, State, and local stakeholders on
data and other Basin-Wide Remedial Investigation activities; (d) groundwater
monitoring to address data gaps at or between SFV Sites; (e) data analysis and
validation; (f) managing general public outreach, e.g., websites, San Fernando
Valley Basin-Wide plume maps, and other materials intended to communicate
Basin-Wide information to the public; (g) contract management for EPA to
maintain a contractor for all SFV Sites; and, (h) general project management costs
related to Basin-Wide activities. Basin-Wide Remedial Investigation Costs include
direct and indirect costs, payroll costs, contractor costs, travel costs, and laboratory
costs.

"Basin-Wide Special Account" means the special account, within the Fund,
established for the Basin-Wide Remedial Investigation by EPA under
section 122(b)(3) of CERCLA.

"Central NHOU Area" means the area, including the groundwater, depicted
on Figure 1, Figure 4, and Figure 5, defined by the following coordinates:

|     | X       | Y       |
|-----|---------|---------|
| NW  | 6441150 | 1898440 |
| NE  | 6448350 | 1898440 |
| SE  | 6448350 | 1890550 |
| SW  | 6441150 | 1890550 |

The Central NHOU Targeted Contamination, the Central NHOU Expanded Well Network, and the NHOU Treatment Plant are located within the boundaries of the Central NHOU Area.

"Central NHOU Conveyance Infrastructure" means the piping and related infrastructure, as set forth in the approved Design, used to transport water from the Central NHOU Expanded Well Network to the NHOU Treatment Plant.

"Central NHOU Expanded Well Network" means the Central NHOU Wells (groundwater extraction wells, NHE-2 through NHE-6, which extend southeasterly, beginning near the former Bendix Facility, for approximately one mile), as well as the three Central ESD Wells included in the Remedial Design (extraction wells CCC-1 through CCC-3, selected in the 2018 ESD, and located northwest of the former Bendix Facility), as depicted on Figure 5.

"Central NHOU Extraction and Treatment System" or "CNETS" means the Central NHOU Expanded Well Network, the Central NHOU Conveyance Infrastructure, and the NHOU Treatment Plant.

"Central NHOU Monitoring Area" means the area, including groundwater, within the boundaries depicted on Figure 4, defined by the following coordinates:

|    | X       | Y       |
|----|---------|---------|
| NW | 6437840 | 1900420 |
| NE | 6452320 | 1900420 |
| SE | 6452320 | 1889130 |
| SW | 6437840 | 1889130 |

"Central NHOU Targeted Contamination" means all COCs identified in Table 2 of the 2014 RODA and Table 6 of the 2009 ROD present in groundwater within the Central NHOU Area as of the Effective Date that are above Performance Standards.  The Central NHOU Targeted Contamination is approximated in Figure 4.

20

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601-9675.

"Consent Decree" or "Decree" means this consent decree, all appendixes attached hereto (listed in Section XXI), and all deliverables incorporated into the Decree under Section 7.6 of the SOW. If there is a conflict between a provision in Sections I through XXVI and a provision in any appendix or deliverable, the provision in Sections I through XXVI controls.

"Day" or "day" means a calendar day. In computing any period under this Decree, the day of the event that triggers the period is not counted and, where the last day is not a working day, the period runs until the close of business of the next working day. "Working day" means any day other than a Saturday, Sunday, or federal or State holiday.

"DOJ" means the United States Department of Justice.

"DTSC" means the California Department of Toxic Substances Control and the Toxic Substances Control Account and their successor departments, agencies, or instrumentalities.

"DTSC Future Response Costs" means all costs, including, but not limited to, direct and indirect costs, that DTSC incurs in reviewing or developing deliverables submitted pursuant to this Decree or the SOW, in overseeing implementation of the Work, or otherwise implementing, overseeing, or enforcing this Decree or the SOW, including, but not limited to, payroll costs, contractor costs, travel costs, laboratory costs, costs relating to financial assurance, the costs of any technical assistance grant under Section 117(e) of CERCLA, 42 U.S.C. § 9617(e), costs relating to Section VII (Property Requirements), Section VIII (Financial Assurance), and Section XIV (Dispute Resolution). This term does not encompass any response actions by DTSC in connection with source control for properties located within or proximate to the boundaries of the NHOU, which are outside the Work covered by this Decree.

21

"DTSC Past Response Costs" means all costs, including, but not limited to, direct and indirect costs, that DTSC paid at or in connection with the NHOU (including, but not limited to, the NHOU2IR), through the Effective Date of this Decree, plus Interest on all such costs that has accrued pursuant to California Health and Safety Code section 25360.1 through such date.

"Effective Date" means the date upon which the Court's approval of this Decree is recorded on its docket.

"EPA" means the United States Environmental Protection Agency.

"Fund" means the Hazardous Substance Superfund established under section 9507 of the Internal Revenue Code, 26 I.R.C. § 9507.

"Future Basin-Wide Costs" means the proportionate share of all Basin-Wide Remedial Investigation Costs that the United States pays after September 30, 2019, and through EPA's Certification of Work Completion (Section 5.11(d) of the SOW), that have been allocated to the NHOU through the Basin-Wide Cost Allocation.

"Future Response Costs" means all costs (including direct, indirect, payroll, contractor, travel, and laboratory costs) that the United States pays in connection with implementation of the NHOU2IR in the Central NHOU Area after September 30, 2019, including but not limited to costs incurred by the United States implementing, overseeing, or enforcing this Decree, including: (i) in developing, reviewing and approving deliverables generated under this Decree; (ii) in overseeing Settling Defendants' performance of the Work; (iii) in assisting or taking action to obtain access or use restrictions under ¶ 66.e; (iv) in securing, implementing, monitoring, maintaining, or enforcing Institutional Controls, including any compensation paid; (v) in taking action under ¶ 76 (Access to Financial Assurance); (vi) in taking response action described in ¶ 118 because of Settling Defendants' failure to take emergency action under Section 5.3 of the SOW; (vii) in implementing a Work Takeover under ¶ 65; (viii) in implementing

22

community involvement activities including the cost of any technical assistance grant provided under section 117(e) of CERCLA; (ix) in enforcing this Decree, including all costs paid under Section XIV (Dispute Resolution) and all litigation costs; (x) in conducting periodic reviews in accordance with section 121(c) of CERCLA; and (xi) resolving the liability of PRPs that contributed contamination addressed by this Decree, but which are not signatories to this Decree. Future Response Costs also includes all Interest accrued after September 30, 2019, on EPA's unreimbursed costs (including Past Response Costs) under section 107(a) of CERCLA.

"Home Depot" means HD Development of Maryland, Inc., a Maryland corporation.

"Honeywell/LADWP License Agreement" means the *License Agreement between the Los Angeles Department of Water and Power and Honeywell International, Inc.*, executed in March 2020 and attached to this Decree as Appendix D.

"Honeywell/LADWP Settlement Agreement" means the *Settlement Agreement between the Los Angeles Department of Water and Power and Honeywell International, Inc.*, executed in December 2019 and attached to this Decree as Appendix E.

"Including" or "including" means "including but not limited to."

"Institutional Controls" means Proprietary Controls (*i.e.*, easements or covenants running with the land that (i) limit land, water, or other resource use, provide access rights, or both and (ii) are created under common law or statutory law by an instrument that is recorded, or for which notice is recorded, in the appropriate land records office) and state or local laws, regulations, ordinances, zoning restrictions, or other governmental controls or notices that: (a) limit land, water, or other resource use to minimize the potential for human exposure to Waste Material at or in connection with the Area 1 Site; (b) limit land, water, or other

23

resource use to implement, ensure noninterference with, or ensure the

protectiveness of the NHOU2IR; (c) provide information intended to modify or

guide human behavior at or in connection with the Site; or (d) any combination

thereof.

"Interest" means interest at the rate specified for interest on investments of

the Fund, as provided under section 107(a) of CERCLA, compounded annually on

October 1 of each year. The applicable rate of interest will be the rate in effect at

the time the interest accrues. The rate of interest is subject to change on October 1

of each year. As of the date of lodging of this Decree, rates are available online at

https://www.epa.gov/superfund/superfund-interest-rates.

"Kaiser" means Kaiser Foundation Health Plan, Inc., a California

corporation.

"LADWP" means the Los Angeles Department of Water and Power.

"National Contingency Plan" or "NCP" means the National Oil and

Hazardous Substances Pollution Contingency Plan promulgated under section 105

of CERCLA, codified at 40 C.F.R. part 300, and any amendments thereto.

"NHOU" means the North Hollywood Operable Unit of the San Fernando

Valley Area 1 Superfund Site.

"NHOU2IR" means the remedial action selected by EPA for the NHOU in

the 2009 ROD and modified by the 2014 RODA, the 2016 Memo to File, and the

2018 ESD.

"NHOU Special Account" means the special account, within the Fund,

established for the NHOU by EPA under section 122(b)(3) of CERCLA.

"NHOU Targeted Contamination" means all contaminants of concern

("COCs") identified in Table 2 of the 2014 RODA and Table 6 of the 2009 ROD

present in groundwater within the NHOU above Performance Standards. The

NHOU Targeted Contamination, as modelled in 2008, is depicted in Figure 2 and

Figure 3. The NHOU Targeted Contamination, as modelled in 2021, is depicted in Figure 4.

"NHOU Treatment Plant" means the facility where water extracted from the Central NHOU Expanded Well Network is treated to reduce concentrations of and/or remove selected contaminants of concern listed in Table 6 of the 2009 ROD and Table 2 of the 2014 RODA. The NHOU Treatment Plant is located on property owned by LADWP on Lankershim Boulevard in Los Angeles, California.

"Paragraph" or "¶" means a portion of this Decree identified by an Arabic numeral or an upper- or lower-case letter.

"Parties" means the United States, the State, and Settling Defendants.

"Past Basin-Wide Costs" means all costs, including but not limited to direct and indirect costs that the United States paid in connection with the Basin-Wide Remedial Investigation in the San Fernando Valley through September 30, 2019.

"Past Response Costs" means all costs (including direct, indirect, payroll, contractor, travel, and laboratory costs) that the United States paid in connection with the NHOU through September 30, 2019, plus all interest on such costs accrued under section 107(a) of CERCLA through such date.

"Performance Standards" means the treatment levels in Exhibit 2 of the SOW, which incorporate the "Performance Standards for COCs in Extracted and Treated Groundwater" in Table 6 of the 2009 ROD and Table 2 of the 2014 RODA, and any updates thereto; the Minimum Annual Average Pumping Rates in the O&M Plan; and other measures of achievement of the remedial action objectives, as set forth in the 2009 ROD, the 2014 RODA, the 2016 Memorandum to File, and the 2018 ESD.

"Plaintiffs" means the United States and DTSC.

"Public Storage" means PSA Institutional Partners, L.P., a California limited partnership.

1    "RCRA" means the Solid Waste Disposal Act, 42 U.S.C. §§ 6901-6992k,
2    (also known as the Resource Conservation and Recovery Act).

3    "Remedial Action" shall mean the design, construction, operation and
4    maintenance of the Central NHOU Extraction and Treatment System and
5    monitoring activities through Remedial Action Completion.  Post-Remedial Action
6    Monitoring, as defined in the SOW, is not part of the Remedial Action.

7    "Remedial Design" means those activities to be undertaken by Settling
8    Work Defendant to develop plans and specifications for implementing the
9    NHOU2IR.

10   "Scope of the Work" means the Scope of the Work set forth in Section 1.3
11   of the SOW.

12   "Section" means a portion of this Decree identified by a Roman numeral.

13   "Settling Cash Defendant" means a signatory to this Decree or a signatory
14   added to this Decree after the Effective Date whose obligations under the Decree
15   are set forth in Section X.  Settling Cash Defendants are identified in Appendix C.

16   "Settling Defendants" means Settling Work Defendant, Settling Cash
17   Defendants, and Settling Owner Defendants.

18   "Settling Owner Defendant" means any Settling Defendant that owns
19   Affected Property in the vicinity of the Area 1 Site.  Settling Owner Defendants are
20   identified in Appendix C.

21   "Settling Work Defendant" means Honeywell International Inc. and any
22   other party identified as a Settling Work Defendant in Appendix C.

23   "Statement of Work" or "SOW" means the document attached as Appendix
24   B, which describes the activities Settling Defendants must perform to implement
25   and maintain the effectiveness of the NHOU2IR.

26   "Transfer" means to sell, assign, convey, lease, mortgage, or grant a security
27   interest in, or where used as a noun, a sale, assignment, conveyance, or other
28   disposition of any interest by operation of law or otherwise.

26

"United States" means the United States of America and each department, agency, and instrumentality of the United States, including EPA.

"Waste Material" means (a) any "hazardous substance" under Section 101(14) of CERCLA; (b) any pollutant or contaminant under section 101(33) of CERCLA; (c) any "solid waste" under section 1004(27) of RCRA; and (d) any of the foregoing terms that are defined under any appropriate or applicable provisions of California law.

"Work" means all obligations of Settling Defendants under Sections VI (Performance of the Work) through IX (Indemnification and Insurance).

"Work Takeover" means EPA's assumption of the performance of any of the Work in accordance with ¶ 65.

## V.    OBJECTIVES

58.    The objectives of the Parties in entering into this Decree are to protect public health, welfare, and the environment through the design, implementation, and maintenance of a response action at the Area 1 Site by Settling Work Defendant, to pay response costs of Plaintiffs, and to resolve and settle the claims of Plaintiffs against Settling Defendants as provided in this Decree.

## VI.    PERFORMANCE OF THE WORK

59.    Settling Work Defendant shall finance, develop, and implement the NHOU2IR in the Central NHOU Area and monitor the effectiveness of the NHOU2IR in the Central NHOU Monitoring Area, all in accordance with the SOW, any modified SOW and all EPA-approved, conditionally approved, or modified deliverables as required by the SOW or modified SOW. Settling Work Defendant's obligations with respect to monitoring the effectiveness of the NHOU2IR in the Central NHOU Monitoring Area are set forth in the Quality Assurance Project Plan. Pursuant to the Honeywell/LADWP Settlement Agreement, LADWP, not Settling Work Defendant, will operate the CNETS and perform maintenance tasks as defined in the Honeywell/LADWP Settlement

27

Agreement.  Despite LADWP's role operating and maintaining the CNETS, Settling Work Defendant is, pursuant to this Decree, the sole party responsible for financing, developing, and implementing the NHOU2IR in the Central NHOU Area and monitoring the effectiveness of the NHOU2IR in the Central NHOU Monitoring Area.

60.    Nothing in this Decree requires Settling Work Defendant, at any time, to step into the role of operator of the NHOU Treatment Plant and deliver treated water to LADWP for use as drinking water, including circumstances where LADWP fails to operate the CNETS consistent with its obligations to Settling Work Defendant in the Honeywell/LADWP Settlement Agreement.  If, however, LADWP fails to operate the CNETS consistent with its obligations to Settling Work Defendant in the Honeywell/LADWP Settlement Agreement and EPA determines that the NHOU2IR cannot be successfully implemented with a drinking water end use, EPA may require Settling Work Defendant, pursuant to its obligations under this Decree, to implement the NHOU2IR with an alternate end use for the treated water.

61.    Nothing in this Decree and no EPA approval of any deliverable required under this Decree constitutes a warranty or representation by EPA or DTSC that completion of the Work will achieve the Performance Standards.

62.    **Modifications to the NHOU2IR and Further Response Actions**

a.    Nothing in this Decree limits EPA's authority to modify the NHOU2IR or to select further response actions for the Area 1 Site in accordance with the requirements of CERCLA and the NCP. Nothing in this Decree limits Settling Work Defendant's rights, under sections 113(k)(2) or 117 of CERCLA, to comment on any modified or further response actions proposed by EPA.

b.    If EPA modifies the NHOU2IR in order to achieve or maintain the RAOs, or both, or to carry out, maintain, and/or improve the effectiveness of the NHOU2IR, and such modification is consistent with the Scope of Work in

Section 1.3 of the SOW then Settling Work Defendant shall implement the
modification as provided in ¶ 62.d.

c.    If EPA modifies the Work in order to achieve or maintain the
RAOs, or both, or to carry out, maintain, and/or improve the effectiveness of the
NHOU2IR, and such modification is consistent with the scope of the NHOU2IR
then Settling Work Defendant shall implement the modification as provided in ¶
62.d.

d.    Upon receipt of notice from EPA that it has modified the
NHOU2IR as provided in ¶ 62.b or modified the Work as provided in ¶ 62.c and
requesting that Settling Work Defendant implement the modified NHOU2IR or the
modification to the Work, Settling Work Defendant shall implement the
modification, subject to its right to initiate dispute resolution under Section XIV
within 30 days after receipt of EPA's notice. Settling Work Defendant shall modify
the SOW, or related work plans, or both in accordance with the modification to the
NHOU2IR or the modification to the Work or, if Settling Work Defendant invokes
dispute resolution, in accordance with the final resolution of the dispute. The
modification to the NHOU2IR, modification to the Work, the approved modified
SOW, and any related work plans will be deemed to be incorporated into and
enforceable under this Decree.

63.    **LADWP Non-Operation of the Central NHOU Extraction and
Treatment System**

a.    In the event LADWP terminates operation of the CNETS or
acceptance of water therefrom, or otherwise indicates it is unable or unwilling to
operate or maintain the CNETS in accordance with the SOW, Settling Work
Defendant shall promptly (no later than thirty (30) days following its learning of
the same) notify EPA consistent with ¶ 134, and within thirty (30) days following
EPA's receipt of such notification, Settling Work Defendant and EPA shall
convene a meeting to discuss a path forward for LADWP's resumed operation of

the CNETS, acceptance of water therefrom, and/or alternatives that ensure progress towards meeting RAOs. If requested by EPA, Settling Work Defendant shall, in advance of such meeting, develop proposed short-term alternative approaches to LADWP's continued operation of the CNETS and acceptance of water therefrom, and assess the necessity and feasibility of those alternatives.

   b. If EPA reasonably determines that LADWP is unable or unwilling, over the long term (i.e. the anticipated operational period of the CNETS necessary to complete the Remedial Action), to operate the CNETS in accordance with the SOW, EPA will provide notice to Settling Work Defendant consistent with ¶ 134. Within 60 days of Settling Work Defendant's receipt of such notice, Settling Work Defendant shall submit to EPA a proposal for implementing the Remedial Action with an alternate end use. Within 20 days of EPA's receipt of such proposal, EPA shall provide to Settling Work Defendant written comments, if any, regarding such proposal. Within 60 days of Settling Work Defendant's receipt of such comments, Settling Work Defendant and EPA shall convene a meeting to finalize a plan for implementing the Remedial Action with an alternate end use. Settling Work Defendant may invoke the procedures set forth in Section XIV to dispute EPA's determination that LADWP is unable or unwilling, over the long term (i.e. the anticipated operational period of the Central NHOU Extraction and Treatment System necessary to complete the Remedial Action), to operate the Central NHOU Extraction and Treatment System in accordance with the SOW.

  64. **Compliance with Applicable Law**. Nothing in this Decree affects Settling Work Defendant's obligations to comply with all applicable federal and state laws and regulations. Settling Work Defendant must also comply with all applicable or relevant and appropriate requirements of all federal and state environmental laws as set forth in the 2009 ROD, the 2014 RODA, and the 2018 ESD and the SOW. The activities conducted in accordance with this Decree, if

approved by EPA, will be deemed to be consistent with the NCP as provided under section 300.700(c)(3)(ii).

65.    **Work Takeover**

a.    If EPA determines that Settling Work Defendant (i) has ceased to perform any of the Work required under this Section; (ii) is seriously or repeatedly deficient or late in performing the Work required under this Section; or (iii) is performing the Work required under this Section in a manner that may cause an endangerment to human health or the environment, EPA may issue a notice of Work Takeover to Settling Work Defendant, including a description of the grounds for the notice and a period of time ("Remedy Period") within which Settling Work Defendant must remedy the circumstances giving rise to the notice. The Remedy Period will be 20 days, unless EPA determines in its unreviewable discretion that there may be an endangerment, in which case the Remedy Period will be 10 days.

b.    If, by the end of the Remedy Period, Settling Work Defendant do not remedy to EPA's satisfaction the circumstances giving rise to the notice of Work Takeover, EPA may notify Settling Work Defendant and, as it deems necessary, commence a Work Takeover.

c.    EPA may conduct the Work Takeover during the pendency of any dispute under Section XIV (Dispute Resolution) but shall terminate the Work Takeover if and when: (i) Settling Work Defendant remedies, to EPA's satisfaction, the circumstances giving rise to the notice of Work Takeover; or (ii) upon the issuance of a final determination under Section XIV (Dispute Resolution) that EPA is required to terminate the Work Takeover.

## VII.   PROPERTY REQUIREMENTS

66.    Agreements Regarding Access and Noninterference

a.    As used in this Section, "Affected Property" means any real property where EPA determines, at any time, that access; land, water, or other

31

resource use restrictions; Institutional Controls; or any combination thereof, are
needed to implement the NHOU2IR.

      b.   Settling Work Defendant shall use best efforts to secure from
the owners, other than Settling Owner Defendants, of all Affected Property, an
agreement, enforceable by Settling Work Defendant and by Plaintiffs, requiring
such owner to provide Plaintiffs and Settling Work Defendant, and their respective
representatives, contractors, and subcontractors with access at all reasonable times
to such owner's property to conduct any activity regarding the Decree, including
the following:

      (1)   implementing the Work and overseeing compliance with the
Decree;

      (2)   conducting investigations of contamination at or near the
NHOU;

      (3)   assessing the need for, planning, or implementing additional
response actions at or near the NHOU;

      (4)   determining whether any real property within the NHOU is
being used in a manner that is prohibited or restricted, or that
may need to be prohibited or restricted under the Decree; and

      (5)   implementing, monitoring, maintaining, reporting on, and
enforcing any land, water, or other resource use restrictions and
Institutional Controls.

      c.   Further, Settling Work Defendant shall use best efforts to
ensure that each agreement required under ¶ 66.b commits the owner to refrain
from using its property in any manner that EPA determines will pose an
unacceptable risk to human health or to the environment as a result of exposure to

32

Waste Material, or will interfere with or adversely affect the implementation, integrity, or protectiveness of the NHOU2IR.

      d.    As used in this Section, "best efforts" means the efforts that a reasonable person in the position of Settling Work Defendant would use to achieve the goal in a timely manner, including the cost of employing professional assistance and the payment of reasonable sums of money to secure access and/or use restriction agreements.

      e.    Settling Work Defendant shall provide to EPA and DTSC a copy of each agreement required under ¶ 66.b. If Settling Work Defendant cannot accomplish what is required through best efforts in a timely manner, it shall notify EPA, and include a description of the steps taken to achieve the requirements. If the United States deems it appropriate, it may assist Settling Work Defendant, or take independent action, to obtain such access or use restrictions.

      67.    **Access and Noninterference by Settling Owner Defendant**. Settling Owner Defendants shall: (a) provide Plaintiffs and the Settling Work Defendant, and their representatives, contractors, and subcontractors with access at all reasonable times to any Affected Property owned by such Settling Owner Defendant to conduct any activity regarding the Decree, including those listed in ¶ 66.b; and (b) refrain from using the Affected Property owned by such Settling Owner Defendant in any manner that EPA determines will pose an unacceptable risk to human health or to the environment because of exposure to Waste Material, or will interfere with or adversely affect the implementation, integrity, or protectiveness of the NHOU2IR.

      68.    If EPA determines in a decision document prepared in accordance with the NCP that Institutional Controls in the form of state or local laws, regulations, ordinances, zoning restrictions, or other governmental controls or notices are appropriate, Settling Defendants shall cooperate with EPA's and the State's efforts to secure and ensure compliance with such Institutional Controls.

33

69. **Notice to Successors-in-Title**

a. Settling Owner Defendants shall, within 15 days after the Effective Date, submit for EPA approval a notice to be recorded regarding its property at the Area 1 Site in the appropriate land records. The notice must: (1) include a proper legal description of the property; (2) provide notice to all successors-in-title: (i) that the property is part of, or affected by, the Area 1 Site; (ii) that EPA has selected a remedy for the NHOU; and (iii) that potentially responsible parties have entered into a Decree requiring implementation of such remedy; and (3) identify the U.S. District Court in which the Decree was filed, the name and civil action number of this case, and the Effective Date of the Decree. Settling Owner Defendant shall record the notice within 10 days after EPA's approval of the notice and submit to EPA, within 10 days thereafter, a certified copy of the recorded notice.

b. Settling Owner Defendant shall, prior to entering into a contract to Transfer any of its property that is part of the Area 1 Site, or 60 days prior to a Transfer of such property, whichever is earlier:

(1) notify the proposed transferee that EPA has selected a remedy regarding the NHOU, that potentially responsible parties have entered into a Consent Decree requiring implementation of such remedy, and that the United States District Court has entered the Decree (identifying the name and civil action number of this case and the date the Court entered the Decree); and

(2) notify EPA and the State of the name and address of the proposed transferee and provide EPA and the State with a copy of the notice that it provided to the proposed transferee.

70. Notwithstanding any provision of the Decree, EPA and the State retain all of their access authorities and rights, as well as all of their rights to require land, water, or other resource use restrictions and Institutional Controls,

34

including related enforcement authorities, under CERCLA, RCRA, and any other applicable statute or regulations.

## VIII.  FINANCIAL ASSURANCE

71.    To ensure completion of the Work required under Section VI, Settling Work Defendant shall secure financial assurance, initially in the amount of $62 million ("Estimated Cost of the Work"), for the benefit of EPA. The financial assurance must: (i) be one or more of the mechanisms listed below, in a form substantially identical to the relevant sample documents available from EPA; and (ii) be satisfactory to EPA. As of the date of lodging of this Decree, the sample documents can be found under the "Financial Assurance - Settlements" category on the Cleanup Enforcement Model Language and Sample Documents Database at https://cfpub.epa.gov/compliance/models/. Settling Defendants may use multiple mechanisms if they are limited to surety bonds guaranteeing payment, letters of credit, trust funds, insurance policies, or some combination thereof. The following are acceptable mechanisms:

a.    a surety bond guaranteeing payment, performance of the Work, or both, that is issued by a surety company among those listed as acceptable sureties on federal bonds as set forth in Circular 570 of the U.S. Department of the Treasury;

b.    an irrevocable letter of credit, payable to EPA or at the direction of EPA, that is issued by an entity that has the authority to issue letters of credit and whose letter-of-credit operations are regulated and examined by a federal or state agency;

c.    a trust fund established for the benefit of EPA that is administered by a trustee that has the authority to act as a trustee and whose trust operations are regulated and examined by a federal or state agency;

d.    a policy of insurance that provides EPA with acceptable rights as a beneficiary thereof and that is issued by an insurance carrier that has the

1    authority to issue insurance policies in the applicable jurisdiction(s) and whose

2    insurance operations are regulated and examined by a federal or state agency;

3            e.    a demonstration by Settling Work Defendant that it meets the

4    relevant test criteria of ¶ 72, accompanied by a standby funding commitment that

5    requires Settling Work Defendant to pay funds to or at the direction of EPA, up to

6    the amount financially assured through the use of this demonstration in the event of

7    a Work Takeover; or

8            f.    a guarantee to fund or perform the Work executed in favor of

9    EPA by a company: (1) that is a direct or indirect parent company of Settling Work

10   Defendant or has a "substantial business relationship" (as defined in 40 C.F.R.

11   § 264.141(h)) with Settling Work Defendant; and (2) demonstrates to EPA's

12   satisfaction that it meets the financial test criteria of ¶ 72.

13       72.    If Settling Work Defendant seeks to provide financial assurance by

14   means of a demonstration or guarantee under ¶ 71.e or 71.f, it must, within 30 days

15   after the Effective Date:

16           a.    demonstrate that:

17           (1)    the Settling Work Defendant or guarantor has:

18                   i.    two of the following three ratios: a ratio of total liabilities

19                        to net worth less than 2.0; a ratio of the sum of net

20                        income plus depreciation, depletion, and amortization to

21                        total liabilities greater than 0.1; and a ratio of current

22                        assets to current liabilities greater than 1.5; and

23                   ii.    net working capital and tangible net worth each at least

24                        six times the sum of the Estimated Cost of the Work and

25                        the amounts, if any, of other federal, state, or tribal

26                        environmental obligations financially assured through the

27                        use of a financial test or guarantee; and

28                   iii.    tangible net worth of at least $10 million; and

36

1          iv.    assets located in the United States amounting to at least

2                 90 percent of total assets or at least six times the sum of

3                 the Estimated Cost of the Work and the amounts, if any,

4                 of other federal, state, or tribal environmental obligations

5                 financially assured through the use of a financial test or

6                 guarantee; or

7     (2)    the Settling Work Defendant or guarantor has:

8          i.     a current rating for its senior unsecured debt of AAA,

9                 AA, A, or BBB as issued by Standard and Poor's or Aaa,

10                Aa, A or Baa as issued by Moody's; and

11         ii.    tangible net worth at least six times the sum of the

12                Estimated Cost of the Work and the amounts, if any, of

13                other federal, state, or tribal environmental obligations

14                financially assured through the use of a financial test or

15                guarantee; and

16         iii.   tangible net worth of at least $10 million; and

17         iv.    assets located in the United States amounting to at least

18                90 percent of total assets or at least six times the sum of

19                the Estimated Cost of the Work and the amounts, if any,

20                of other federal, state, or tribal environmental obligations

21                financially assured through the use of a financial test or

22                guarantee; and

23    b.    submit to EPA for the Settling Work Defendant or guarantor:

24    (1) a copy of an independent certified public accountant's report of the entity's

25    financial statements for the latest completed fiscal year, which must not express an

26    adverse opinion or disclaimer of opinion; and (2) a letter from its chief financial

27    officer and a report from an independent certified public accountant substantially

28    identical to the sample letter and reports available from EPA. As of the date of

37

lodging of this Decree, a sample letter and report is available under the "Financial
Assurance - Settlements" subject list category on the Cleanup Enforcement Model
Language and Sample Documents Database at
https://cfpub.epa.gov/compliance/models/.

73.    If Settling Work Defendant provides financial assurance by means of
a demonstration or guarantee under ¶ 71.e or 71.f, it must also:

a.    annually resubmit the documents described in ¶ 72.b within
90 days after the close of the Settling Work Defendant's or guarantor's fiscal year;

b.    notify EPA within 30 days after the Settling Work Defendant or
guarantor determines that it no longer satisfies the relevant financial test criteria
and requirements set forth in this Section; and

c.    provide to EPA, within 30 days of EPA's request, reports of the
financial condition of the Settling Work Defendant or guarantor in addition to
those specified in ¶ 72.b; EPA may make such a request at any time based on a
belief that the Settling Work Defendant or guarantor may no longer meet the
financial test requirements of this Section.

74.    Settling Work Defendant has selected, and EPA has found
satisfactory, an irrevocable letter of credit as an initial form of financial assurance.
Within 30 days after the Effective Date, Settling Work Defendant shall secure all
executed or otherwise finalized mechanisms or other documents consistent with
the EPA-approved form of financial assurance and shall submit such mechanisms
and documents to the Regional Financial Management Officer, to DOJ, to EPA,
and to the State.

75.    Settling Work Defendant shall diligently monitor the adequacy of the
financial assurance. If Settling Work Defendant becomes aware of any information
indicating that the financial assurance provided under this Section is inadequate or
otherwise no longer satisfies the requirements of this Section, Settling Work
Defendant shall notify EPA of such information within seven days. If EPA

determines that the financial assurance provided under this Section is inadequate or otherwise no longer satisfies the requirements of this Section, EPA will notify Settling Work Defendant of such determination. Settling Work Defendant shall, within 30 days after notifying EPA or receiving notice from EPA under this Paragraph, secure and submit to EPA for approval a proposal for a revised or alternative financial assurance mechanism that satisfies the requirements of this Section. EPA may extend this deadline for such time as is reasonably necessary for the affected Settling Work Defendant, in the exercise of due diligence, to secure and submit to EPA a proposal for a revised or alternative financial assurance mechanism, not to exceed 60 days. Settling Work Defendant shall follow the procedures of ¶ 77 in seeking approval of, and submitting documentation for, the revised or alternative financial assurance mechanism. Settling Work Defendant's inability to secure financial assurance in accordance with this Section does not excuse performance of any other requirement of this Decree.

76.    **Access to Financial Assurance**

a.    If EPA issues a notice of a Work Takeover under ¶ 65.b, then, in accordance with any applicable financial assurance mechanism, EPA may require that any funds guaranteed be paid in accordance with ¶ 76.d.

b.    If EPA is notified that the issuer of a financial assurance mechanism intends to cancel the mechanism, and Settling Work Defendant fails to provide an alternative financial assurance mechanism in accordance with this Section at least 30 days prior to the cancellation date, the funds guaranteed under such mechanism must be paid prior to cancellation in accordance with ¶ 76.d.

c.    If, upon issuance of a notice of a Work Takeover under ¶ 65.b, either: (1) EPA is unable for any reason to promptly secure the resources guaranteed under any applicable financial assurance mechanism, including the related standby funding commitment, whether in cash or in kind, to continue and complete the Work; or (2) the financial assurance is a demonstration or guarantee

39

under ¶ 71.e or 71.f, then EPA is entitled to demand an amount, as determined by EPA, sufficient to cover the cost of the remaining Work to be performed. Settling Work Defendant shall, within 60 days after such demand, pay the amount demanded as directed by EPA.

d.      Any amounts required to be paid under this ¶ 76 must be, as directed by EPA: (i) paid to EPA in order to facilitate the completion of the Work by EPA or by another person; or (ii) deposited into an interest-bearing account, established at a duly chartered bank or trust company that is insured by the FDIC, in order to facilitate the completion of the Work by another person. If payment is made to EPA, EPA may deposit the payment into the Fund or into the NHOU Special Account to be retained and used to conduct or finance response actions at or in connection with the SFV Sites, or to be transferred by EPA to the Fund.

77.     **Modification of Amount, Form, or Terms of Financial Assurance**. Beginning after the first anniversary of the Effective Date, and no more than once per calendar year, Settling Work Defendant may submit a request to change the form, terms, or amount of the financial assurance mechanism. Any such request must be submitted to EPA in accordance with ¶ 74, and must include an estimate of the cost of the remaining Work, an explanation of the bases for the cost calculation, and a description of the proposed changes, if any, to the form or terms of the financial assurance. EPA will notify Settling Work Defendant of its decision regarding the request. Settling Work Defendant may initiate dispute resolution under Section XIV regarding EPA's decision within 30 days after receipt of the decision. Settling Work Defendant may modify the form, terms, or amount of the financial assurance mechanism only: (a) in accordance with EPA's approval; or (b) in accordance with any resolution of a dispute under Section XIV. Settling Work Defendant shall submit to EPA, within 30 days after receipt of EPA's approval or consistent with the terms of the resolution of the dispute,

documentation of the change to the form, terms, or amount of the financial assurance instrument.

78.    **Release, Cancellation, or Discontinuation of Financial Assurance**. Settling Work Defendant may release, cancel, or discontinue any financial assurance provided under this Section only: (a) if EPA issues a Certification of Work Completion under Section 5.11 of the SOW; (b) in accordance with EPA's approval of such release, cancellation, or discontinuation; or (c) if there is a dispute regarding the release, cancellation or discontinuance of any financial assurance, in accordance with the agreement, final administrative decision, or final judicial decision resolving such dispute under Section XIV.

## IX.    INDEMNIFICATION AND INSURANCE

79.    **Indemnification**

Plaintiffs do not assume any liability by entering into this Decree or by virtue of any designation of Settling Work Defendant as EPA's and the State's authorized representative under section 104(e)(1) of CERCLA. Settling Work Defendant shall indemnify and save and hold harmless Plaintiffs and their officials, agents, employees, contractors, subcontractors, and representatives for or from any claims or causes of action arising from, or on account of, negligent or other wrongful acts or omissions of Settling Work Defendant, its officers, directors, employees, agents, contractors, subcontractors, any entities that are operating and/or maintaining any part of the CNETS, and any persons acting on Settling Work Defendant's behalf or under its control, in carrying out activities under this Decree ("Work Entities"), including any claims arising from any designation of Settling Work Defendant as EPA's and the State's authorized representatives under section 104(e)(1) of CERCLA. Further, Settling Work Defendant agrees to pay Plaintiffs all costs they incur including attorneys' fees and other expenses of litigation and settlement arising from, or on account of, claims made against Plaintiffs based on negligent or other wrongful acts or omissions of the Work

41

Entities. Plaintiffs may not be held out as parties to any contract entered into by or on behalf of Settling Work Defendant in carrying out activities under this Decree. The Work Entities may not be considered an agent of Plaintiffs.

a.     Each Plaintiff shall give Settling Work Defendant notice of any claim for which such Plaintiff plans to seek indemnification in accordance with this ¶ 79, and shall consult with Settling Work Defendant prior to settling such claim.

80.     Settling Work Defendant covenants not to sue and shall not assert any claim or cause of action against Plaintiffs for damages or reimbursement or for set-off of any payments made or to be made to Plaintiffs, arising from or on account of any contract, agreement, or arrangement between Settling Work Defendant and any person for performance of Work or other activities on or relating to the Area 1 Site, including claims on account of construction delays. In addition, Settling Work Defendant shall indemnify and save and hold Plaintiffs harmless with respect to any claims for damages or reimbursement arising from or on account of any contract, agreement, or arrangement between Settling Work Defendant and any person for performance of work at or relating to the Area 1 Site, including claims on account of construction delays.

81.     **Insurance**. Settling Work Defendant shall secure, by no later than 15 days before commencing any on-site Work, the following insurance: (a) commercial general liability insurance with limits of liability of $1 million per occurrence; (b) automobile liability insurance with limits of liability of $1 million per accident; and (c) umbrella liability insurance with limits of liability of $5 million in excess of the required commercial general liability and automobile liability limits. The insurance policy must name Plaintiffs as additional insureds with respect to all liability arising out of the activities performed by or on behalf of Settling Work Defendant under this Decree. Settling Work Defendant shall maintain this insurance until the first anniversary after issuance of EPA's

Certification of Work Completion under Section 5.11 of the SOW. In addition, for the duration of this Decree, Settling Work Defendant shall satisfy, or shall ensure that its contractors or subcontractors satisfy, all applicable laws and regulations regarding the provision of worker's compensation insurance for all persons performing the Work on behalf of Settling Work Defendant in furtherance of this Decree. Prior to commencement of the Work, Settling Work Defendant shall provide to EPA certificates of such insurance and a copy of each insurance policy. Settling Work Defendant shall resubmit such certificates and copies of policies each year on the anniversary of the Effective Date. If Settling Work Defendant demonstrates by evidence satisfactory to EPA that any contractor or subcontractor maintains insurance equivalent to that described above, or insurance covering the same risks but in a lesser amount, then, with respect to that contractor or subcontractor, Settling Work Defendant need provide only that portion of the insurance described above that is not maintained by the contractor or subcontractor. Settling Work Defendant shall ensure that all submittals to EPA under this Paragraph identify the NHOU, Los Angeles, California and the civil action number of this case.

## X.    OBLIGATIONS OF SETTLING CASH DEFENDANTS

82.    **Obligations of Settling Cash Defendants.** Each Settling Cash Defendant's obligations under this Decree shall be limited to Section VII (Property Requirements), Section XI (Payments For Response Costs), Section XVII (Covenants by Settling Defendants), Section XIX (Records), and the payment of its requisite amount as agreed to by the Settling Cash Defendant. No Settling Cash Defendant shall be responsible for any payment required of any other party.

## XI.    PAYMENTS FOR RESPONSE COSTS

83.    **Past Response Cost Payment by Settling Cash Defendants and Settling Defendants Added to the Decree After the Effective Date**. As to Settling Cash Defendants that are signatories to this Decree as of the Effective

Date, each Settling Cash Defendant shall pay EPA, within 30 days after the Effective Date, in reimbursement of Past Response Costs in connection with the NHOU and Past Basin-Wide Costs, $250,000. As to Settling Defendants that are added to the Decree after the Effective Date, such Settling Defendants shall pay EPA, within 30 days after the Court enters the modification adding such Settling Defendants, in reimbursement of Past Response Costs in connection with the NHOU and Past Basin-Wide Costs, the amounts specified in the modification.  The Financial Litigation Unit ("FLU") of the United States Attorney's Office for the Central District of California shall provide to Settling Cash Defendants or Settling Defendants added to the Decree after the Effective Date instructions for making this payment, including a Consolidated Debt Collection System ("CDCS") reference number. Settling Cash Defendants and Settling Defendants added to the Decree after the Effective Date shall make such payment at https://www.pay.gov in accordance with the FLU's instructions, including references to the CDCS Number. Settling Cash Defendants and Settling Defendants added to the Decree after the Effective Date shall send notices of this payment to DOJ and EPA. If the payment required under this Paragraph is late, Settling Cash Defendants and Settling Defendants added to the Decree after the Effective Date shall pay, in addition to any stipulated penalties owed under Section XV, an additional amount for Interest accrued from the Effective Date until the date of payment or, if applicable, Interest accrued from the date the Court enters the modification adding such Settling Defendants to the Decree until the date of payment.

84.  **Payments by Settling Work Defendant for Future Response Costs**

a.  **Periodic Bills**. On a periodic basis, EPA will send Settling Work Defendant a bill or bills for Future Response Costs and Settling Work Defendant's proportionate share of Future Basin-Wide Costs, including a standard cost summary listing direct and indirect costs paid by EPA, its contractors, subcontractors, and DOJ. Settling Work Defendant's proportionate share of Future

Basin-Wide Costs shall be 53.2% of the NHOU share of Basin-Wide Remedial Investigation costs, as determined by the Basin-Wide Cost Allocation. Settling Work Defendant may initiate a dispute under Section XIV regarding a Future Response Cost or Future Basin-Wide Cost billing, but only if the dispute relates to one or more of the following issues: (i) whether EPA has made an arithmetical error; (ii) whether EPA has included a cost item that is not within the definition of Future Response Costs or Future Basin-Wide Costs; or (iii) whether EPA has paid excess costs as a direct result of an EPA action that was inconsistent with a specific provision or provisions of the NCP. Settling Work Defendant must specify in the Notice of Dispute the contested costs and the basis for the objection.

        **b.**    **Payment of Bill**. Settling Work Defendant shall pay the bill or bills, or if it initiates dispute resolution, the uncontested portion of the bill, if any, within 30 days after receipt of the bill or bills. Settling Work Defendant shall pay the contested portion of the bill determined to be owed, if any, within 30 days after the determination regarding the dispute. Each payment for: (i) the uncontested bill or portion of bill, if late, and; (ii) the contested portion of the bill determined to be owed, if any, must include an additional amount for Interest accrued from the date of receipt of the bill through the date of payment. Settling Work Defendant shall make payment at https://www.pay.gov using the "EPA Miscellaneous Payments Cincinnati Finance Center" link, and including references to the Site/Spill ID and DJ numbers listed in ¶ 134 and the purpose of the payment. Settling Work Defendant shall send notices of this payment to DOJ and EPA.

85.    **Payment by Settling Work Defendant and Settling Cash Defendants for DTSC Past Response Costs.** Within 30 days after the Effective Date, as to Settling Work Defendant and Settling Cash Defendants that are signatories to this Decree as of the Effective Date, such Settling Work Defendant and Settling Cash Defendants shall pay DTSC, in reimbursement of DTSC Past Response Costs, $21,952.57. As to Settling Defendants that are added to the

Decree after the Effective Date, such Settling Defendants shall pay DTSC, within 30 days after the Court enters the modification adding such Settling Defendants, in reimbursement of DTSC Past Response Costs, the amounts specified in the modification. Payment shall be made by certified or cashier's check payable to the California Department of Toxic Substance Control in accordance with the "Pay by Check or Money Order" instructions set forth in https://dtsc.ca.gov/make-a-payment/ and shall bear on its face the court's case number for this proceeding. See "Pay by Credit Card" instructions at the same link and click the "Consent Orders and Stipulations" link to make a Credit Card payment. Email a copy of the check or money order, or receipt of Credit Card transaction to Ahmad Bajouk, Administrative Project Manager, Site Mitigation and Restoration Program, Department of Toxic Substances Control at Ahmad.Bajouk@dtsc.ca.gov.

86. **Payments by Settling Work Defendant for DTSC Future Response Costs**.

a. **Periodic Bills.** On a periodic basis, DTSC will send Settling Work Defendant a bill for DTSC Future Response Costs, including a standard cost summary listing direct and indirect costs paid by DTSC, its contractors, subcontractors, and the California Department of Justice. Settling Work Defendant may initiate a dispute under Section XIV regarding a DTSC Future Response Cost billing, but only if the dispute relates to one or more of the following issues: (i) whether DTSC has made an arithmetical error; (ii) whether DTSC has included a cost item that is not within the definition of Future Response Costs; or (iii) whether DTSC has paid excess costs as a direct result of a DTSC action that was inconsistent with a specific provision or provisions of the NCP. Settling Work Defendant must specify in the Notice of Dispute the contested costs and the basis for the objection.

b. **DTSC Future Response Costs Payments.** For all payments subject to ¶ 86.a, Settling Work Defendant shall make such payments by certified

1  or cashier's check payable to the California Department of Toxic Substance

2  Control in accordance with the "Pay by Check or Money Order" instructions set

3  forth in https://dtsc.ca.gov/make-a-payment/ and shall bear on its face the court's

4  case number for this proceeding. See "Pay by Credit Card" instructions at the same

5  link and click the "Consent Orders and Stipulations" link to make a Credit Card

6  payment.  Email a copy of the check or money order, or receipt of Credit Card

7  transaction to Ahmad Bajouk, Administrative Project Manager, Site Mitigation and

8  Restoration Program, Department of Toxic Substances Control at

9  Ahmad.Bajouk@dtsc.ca.gov.

10      87.    **Deposit of Payments**. EPA may, in its unreviewable discretion,

11  deposit the amounts paid under ¶¶ 83, and 84.b in the Fund, in the NHOU Special

12  Account, the Disbursement Special Account, and/or the Basin-Wide Special

13  Account. EPA may, in its unreviewable discretion, retain and use any amounts

14  deposited in the special accounts to conduct or finance response actions at or in

15  connection with the SFV Sites, or transfer those amounts to the Fund.

16      **XII.   DISBURSEMENT OF SPECIAL ACCOUNT FUNDS**

17      88.    **Creation of the Disbursement Special Account and Agreement to**

18  **Disburse Funds to Settling Work Defendant**. Within 30 days following the

19  deposit into the NHOU Special Account of those proceeds received from the

20  Settling Cash Defendants that are signatories to this Decree as of the Effective

21  Date pursuant to ¶ 83, EPA shall establish the "Disbursement Special Account"

22  and shall transfer $750,000 from the NHOU Special Account to the Disbursement

23  Special Account. Subject to the terms and conditions set forth in this Section, EPA

24  agrees to make the funds in the Disbursement Special Account, including Interest

25  Earned on the funds in the Disbursement Special Account, available for

26  disbursement to Settling Work Defendant as partial reimbursement for

27  performance of the Work. EPA shall disburse funds from the Disbursement Special

28  Account to Settling Work Defendant in accordance with the procedures and

47

milestones for phased disbursement set forth in this Section. For purposes of this Paragraph, "Interest Earned" means interest earned on amounts in the Disbursement Special Account, which will be computed monthly at a rate based on the annual return on investments of the EPA Hazardous Substance Superfund. The applicable rate of interest will be the rate in effect at the time the interest accrues. Nothing in this Decree shall be interpreted to require EPA to obligate funds in excess of amounts available in violation of the Antideficiency Act, 31 U.S.C. § 1341, or construed as implying that Congress will, at a later date, appropriate any funds sufficient to meet any deficiency.

89. **Timing and Amount of Disbursements**. Within 30 days after EPA's receipt of a Cost Summary and Certification, as defined by ¶ 91.b, or if EPA has requested additional information under ¶ 91.b or a revised Cost Summary and Certification under ¶ 91.d, within 30 days after receipt of the additional information or revised Cost Summary and Certification, and subject to the conditions set forth in this Section, EPA shall disburse the funds from the Disbursement Special Account at the completion of the following milestones, and in the amounts set forth below:

**Milestone Funds to be Disbursed:**

(1)    EPA approval, pursuant to Section 4.3 of the SOW, of the Final (100%) Remedial Design: 50% of funds.

(2)    EPA notice to Settling Work Defendant, pursuant to Section 5.6(d)(8) of the SOW, that Central NHOU Construction is complete:  Remainder of funds.

90. EPA shall disburse the funds from the Disbursement Special Account to Settling Work Defendant in the following manner:

Honeywell International Inc

Remediation and Redevelopment Group

Flora Avendano

48

1                  Admin Project Support Specialist

2                  115 Tabor Road

3                  Morris Plains, NJ  07950

4      91.    **Requests for Disbursement of Special Account Funds**

5          a.     Within 20 days after issuance of EPA's written confirmation that a milestone of the Work, as defined in ¶ 89, has been satisfactorily completed, Settling Work Defendant shall submit to EPA a Cost Summary and Certification, as defined in ¶ 91.b, covering the Work performed up to the date of completion of that milestone. Settling Work Defendant shall not include in any submission costs included in a previous Cost Summary and Certification following completion of an earlier milestone of the Work if those costs have been previously sought or reimbursed in accordance with ¶ 89.

          b.     Each Cost Summary and Certification must include a complete and accurate written cost summary and certification of the necessary costs incurred and paid by Settling Work Defendant for the Work covered by the particular submission, excluding costs not eligible for disbursement under ¶ 92. Each Cost Summary and Certification must contain the following statement signed by the Vice President of Global Remediation and Site Redevelopment or other person acceptable to EPA.

> To the best of my knowledge, after thorough investigation and review of Settling Work Defendant's documentation of costs incurred and paid for Work performed in accordance with this Decree [insert, as appropriate: "up to the date of completion of milestone 1," or "between the date of completion of milestone 1 and the date of completion of milestone 2,"] I certify that the information contained in or accompanying this submission is true, accurate, and complete. I am aware that there are significant penalties for knowingly submitting false information, including the possibility of fine and imprisonment.

c.      The Vice President of Global Remediation and Site Redevelopment or other person acceptable to EPA shall also provide EPA a list of the documents that he or she reviewed in support of the Cost Summary and Certification. Upon request by EPA, Settling Work Defendant shall submit to EPA any additional information that EPA deems necessary for its review and approval of a Cost Summary and Certification.

d.      If EPA finds that a Cost Summary and Certification includes an arithmetical error, costs excluded under ¶ 92, or costs that are inadequately documented, or costs submitted in a prior Cost Summary and Certification, it will notify Settling Work Defendant and provide it an opportunity to cure the deficiency by submitting a revised Cost Summary and Certification. If Settling Work Defendant fails to cure the deficiency within twenty days after being notified of, and given the opportunity to cure, the deficiency, EPA will recalculate Settling Work Defendant's costs eligible for disbursement for that submission and disburse the corrected amount to Settling Work Defendant in accordance with the procedures in ¶ 89. Settling Work Defendant may dispute EPA's recalculation under this Paragraph in accordance with Section XIV. In no event may Settling Work Defendant be disbursed funds from the Disbursement Special Account in excess of amounts properly documented in a Cost Summary and Certification accepted or modified by EPA.

92.    **Costs Excluded from Disbursement**. The following costs are excluded from, and may not be sought by Settling Work Defendant for, disbursement from the Disbursement Special Account: (a) response costs paid in accordance with Section XI; (b) any other payments made by Settling Work Defendant to the United States in accordance with this Decree, including any Interest or stipulated penalties paid in accordance with Sections XI or XV; (c) attorneys' fees and costs, except for reasonable attorneys' fees and costs necessarily related to those required by Section VII; (d) costs of any response

50

activities Settling Work Defendant performs that are not required under, or
approved by EPA under, this Decree; (e) costs related to Settling Work
Defendant's litigation, settlement, development of potential contribution claims, or
identification of defendants; (f) internal costs of Settling Work Defendant,
including salaries, travel, or in-kind services, except for those costs that represent
the work of employees of Settling Work Defendant directly performing the Work;
(g) any costs incurred by Settling Work Defendant before the Effective Date:
except for approved Work completed in accordance with this Decree; or (h) any
costs incurred by Settling Defendants under Section XIV.

93.    **Termination of Disbursements**. EPA's obligation to disburse funds
from the Disbursement Special Account under this Decree terminates upon EPA's
determination that Settling Work Defendant: (a) has knowingly submitted a
materially false or misleading Cost Summary and Certification; (b) has submitted a
materially inaccurate or incomplete Cost Summary and Certification, and has
failed to correct the materially inaccurate or incomplete Cost Summary and
Certification within twenty days after being notified of, and given the opportunity
to cure, the deficiency; or (c) failed to submit a Cost Summary and Certification as
required by ¶ 91 within 30 days (or such longer period as EPA agrees) after being
notified that EPA intends to terminate its obligation to make disbursements under
this Section because of Settling Work Defendant's failure to submit the Cost
Summary and Certification as required by ¶ 91. EPA's obligation to disburse funds
from the Disbursement Special Account also terminates upon EPA's assumption of
performance of any portion of the Work in accordance with ¶ 65, when such
assumption of performance of the Work is not challenged by Settling Defendants
or, if challenged, is upheld under Section XIV. Settling Work Defendant may
dispute EPA's termination of special account disbursements under Section XIV.

94.    **Recapture of Disbursements**. Upon termination of disbursements
from the Disbursement Special Account under ¶ 93, if EPA has previously

disbursed funds from the Disbursement Special Account for activities specifically related to the reason for termination, e.g., discovery of a materially false or misleading submission after disbursement of funds based on that submission, EPA shall submit a bill to Settling Work Defendant for those amounts already disbursed from the Disbursement Special Account specifically related to the reason for termination, plus Interest on that amount covering the period from the date of disbursement of the funds by EPA to the date of repayment of the funds by Settling Work Defendant. Within thirty days after receipt of EPA's bill, Settling Work Defendant shall reimburse the Fund for the total amount billed. Payment must be made in accordance with ¶ 84.b. Upon receipt of payment, EPA may, in its sole discretion, deposit all or any portion thereof in the NHOU Special Account, the Disbursement Special Account, or the Fund.

95.    **Balance of Special Account Funds**. After EPA issues its written Certification of Remedial Action Completion in accordance with this Decree, and after EPA completes all disbursement to Settling Work Defendant in accordance with this Section, if any funds remain in the Disbursement Special Account, EPA may, in its sole discretion, transfer such funds to the NHOU Special Account or to the Fund.

## XIII.  FORCE MAJEURE

96.    "Force majeure," for purposes of this Decree, means any event arising from causes beyond the control of the Work Entities, that delays or prevents the performance of any obligation under this Decree despite the best efforts of the Work Entities to fulfill the obligation. Given the need to protect public health and welfare and the environment, the requirement that the Work Entities exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure and best efforts to address the effects of any potential force majeure (a) as it is occurring and (b) following the potential force majeure such that the delay and any adverse effects of the delay are minimized to the greatest

extent possible. "Force majeure" does not include financial inability to complete the Work or a failure to achieve the Performance Standards.

97.    If any event occurs for which Settling Work Defendant will or may claim a force majeure, Settling Work Defendant shall notify EPA's Project Coordinator by email. The deadline for the initial notice is three days after the date the Settling Work Defendant first knew or should have known that the event would likely delay performance. Settling Work Defendant shall be deemed to know of any circumstance of which the Work Entities knew or should have known. Within five days thereafter, Settling Work Defendant shall send a further notice to EPA and the State that includes: (i) a description of the event and its effect on Settling Work Defendant's completion of the requirements of the Decree; (ii) a description of all actions taken or to be taken to prevent or minimize the adverse effects or delay; (iii) the proposed extension of time for Settling Work Defendant to complete the requirements of the Decree; (iv) a statement as to whether, in the opinion of Settling Work Defendant, such event may cause or contribute to an endangerment to public health or welfare, or the environment; and (v) all available proof supporting their claim of force majeure. Failure to comply with the notice requirements herein regarding an event precludes Settling Work Defendant from asserting any claim of force majeure regarding that event, provided, however, that if EPA, despite late or incomplete notice, is able to assess to its satisfaction whether the event is a force majeure under ¶ 96 and whether Settling Work Defendant has exercised its best efforts under ¶ 96, EPA may, in its unreviewable discretion, excuse in writing Settling Work Defendant's failure to submit timely or complete notices under this Paragraph.

98.    EPA, after a reasonable opportunity for review and comment by the State, will notify Settling Work Defendant of its determination whether Settling Work Defendant is entitled to relief under ¶ 96, and, if so, the duration of the extension of time for performance of the obligations affected by the force majeure.

An extension of the time for performance of the obligations affected by the force
majeure shall not, of itself, extend the time for performance of any other
obligation. Settling Work Defendant may initiate dispute resolution under
Section XIV regarding EPA's determination within 15 days after receipt of the
determination. In any such proceeding, Settling Work Defendant has the burden of
proving that it is entitled to relief under ¶ 96 and that their proposed extension was
or will be warranted under the circumstances.

99.   The failure by EPA to timely complete any activity under the Decree
or the SOW is not a violation of the Decree, provided, however, that if such failure
prevents Settling Defendants from timely completing a requirement of the Decree,
Settling Defendants may seek relief under this Section.

## XIV.  DISPUTE RESOLUTION

100.   Unless otherwise provided in this Decree, Settling Defendants must
use the dispute resolution procedures of this Section to resolve any dispute arising
under this Decree. Settling Defendants shall not initiate a dispute challenging the
2009 ROD or any of its modifications. The United States may enforce any
requirement of the Decree that is not the subject of a pending dispute under this
Section.

101.   A dispute will be considered to have arisen when one or more Parties
sends a written notice of dispute ("Notice of Dispute"). Disputes arising under this
Decree must in the first instance be the subject of informal negotiations between
the parties to the dispute. The period for informal negotiations may not exceed
20 days after the dispute arises, unless the parties to the dispute otherwise agree. If
the parties to the dispute cannot resolve the dispute by informal negotiations, the
position advanced by EPA is binding unless Settling Defendants initiate formal
dispute resolution under ¶ 102. By agreement of the parties to the dispute,
mediation may be used during this informal negotiation period to assist the parties
in reaching a voluntary resolution or narrowing of the matters in dispute.

102.    **Formal Dispute Resolution**

a.      **Statements of Position**. Settling Defendants may initiate formal dispute resolution by serving on the Plaintiffs, within 30 days after the conclusion of informal dispute resolution under ¶ 101, an initial Statement of Position regarding the matter in dispute. The Plaintiffs' responsive Statements of Position are due within 30 days after receipt of the initial Statement of Position. All Statements of Position must include supporting factual data, analysis, opinion, and other documentation. A reply, if any, is due within 14 days after receipt of the response. If appropriate, EPA may extend the deadlines for filing statements of position for up to 45 days and may allow the submission of supplemental statements of position.

b.      **Formal Decision**. The Director of the Superfund & Emergency Management Division, EPA Region IX, will issue a formal decision resolving the dispute ("Formal Decision") based on the statements of position and any replies and supplemental statements of position. The Formal Decision is binding on Settling Defendants unless they timely seek judicial review under ¶ 103.

c.      **Compilation of Administrative Record**. EPA shall compile an administrative record regarding the dispute, which must include all statements of position, replies, supplemental statements of position, and the Formal Decision.

103.    **Judicial Review**

a.      Settling Defendants may obtain judicial review of the Formal Decision by filing, within 30 days after receiving it, a motion with the Court and serving the motion on all Parties. The motion must describe the matter in dispute and the relief requested. The parties to the dispute shall brief the matter in accordance with local court rules.

b.      **Review on the Administrative Record**. Judicial review of disputes regarding the following issues must be on the administrative record: (i) the adequacy or appropriateness of deliverables required under the Decree;

55

(ii) the adequacy of the performance of the NHOU2IR; (iii) whether a Work Takeover is warranted under ¶ 65; (iv) determinations about financial assurance under Section VIII; (v) EPA's selection of modified or further response actions; (vi) any other items requiring EPA approval under the Decree; and (vii) any other disputes that the Court determines should be reviewed on the administrative record. For all of these disputes, Settling Defendants bear the burden of demonstrating that the Formal Decision was arbitrary and capricious or otherwise not in accordance with law.

      c.    Judicial review of any dispute not governed by ¶ 103.b shall be governed by applicable principles of law.

104. **Escrow Account**. For disputes regarding a Future Response Cost billing, Settling Defendants shall: (a) establish, in a duly chartered bank or trust company, an interest-bearing escrow account that is insured by the Federal Deposit Insurance Corporation ("FDIC"); (b) remit to that escrow account funds equal to the amount of the contested Future Response Costs; and (c) send to EPA copies of the correspondence and of the payment documentation (e.g., the check) that established and funded the escrow account, including the name of the bank, the bank account number, and a bank statement showing the initial balance in the account. EPA may, in its unreviewable discretion, waive the requirement to establish the escrow account. Settling Defendants shall cause the escrow agent to pay the amounts due to EPA and the State under ¶ 84, if any, by the deadline for such payment in ¶ 84. Settling Defendants are responsible for any balance due under ¶ 84 after the payment by the escrow agent.

105. The initiation of dispute resolution procedures under this Section does not extend, postpone, or affect in any way any requirement of this Decree, except as EPA agrees, or as determined by the Court. Stipulated penalties with respect to the disputed matter will continue to accrue, but payment is stayed pending resolution of the dispute, as provided in ¶ 110.

106.    The United States and Settling Work Defendant acknowledge that, depending on the nature of the dispute, it may help facilitate resolution if LADWP participates in the dispute resolution process set forth in this Section XIV, and upon mutual agreement, the United States and Settling Work Defendant may invite LADWP to participate.

## XV.    STIPULATED PENALTIES

107.    Unless the noncompliance is excused under Section XIII (Force Majeure), Settling Defendants are liable to the United States and the State for the following stipulated penalties for any failure to pay any amount due under Section XI (Payments For Response Costs):

| Period of Noncompliance | Penalty Per Noncompliance Per Day |
|---|---|
| 1st through 14th day | $1,000 |
| 15th through 30th day | $2,500 |
| 31st day and beyond | $5,000 |

108.    Unless the noncompliance is excused under Section XIII (Force Majeure), Settling Defendants are liable to the United States for the following stipulated penalties:

        a.    for any failure to establish and maintain financial assurance in accordance with Section VIII (Financial Assurance); or failure to provide notice as required anywhere in this Decree:

| Period of Noncompliance | Penalty Per Noncompliance Per Day |
|---|---|
| 1st through 7th day | $2,000 |
| 8th through 14th | $3,000 |
| 15th through 30th day | $4,000 |
| 31st day and beyond | $5,000 |

b.      for each failure of the treatment system to meet a Performance

Standard at the effluent:

| Period of Noncompliance | Penalty Per Noncompliance Per Day |
|---|---|
| 1st day, if the concentration in the effluent is greater than the Performance Standard but less than 10 times the Performance Standard | $10,000 |
| 1st day, if the concentration in the effluent is 10 times the Performance Standard or greater | $25,000 |
| 2nd through 30th day | $3,500 |
| 31st day and beyond | $10,000 |

c.      for each failure to achieve the Minimum Annual Average

Pumping Rate ("MAAPR") for each well as set forth in the O&M Plan (SOW

Section 5.7(a));[1]

| Extent of Noncompliance | Penalty for Pumping Shortfall |
|---|---|
| Each percentage point below the MAAPR, e.g., pumping at 99% of MAAPR is one percentage point below MAAPR | $3,500 |

---

[1] This stipulated penalty may be assessed a maximum of once per year for each well.

58

d.    for each failure to (i) certify that the Settling Work Defendant has implemented all activities under the *Operational Support Plan*, as required pursuant to Section 6.2(q) of the SOW, or (ii) maintain supply (either through having the part in stock, under order, or available via a procurement contract) of the parts and equipment necessary for operation of Central NHOU Extraction and Treatment System, as required under the *CCC Operational Support Plan, Exhibit 1 to the SOW*:[2]

|  | Penalty Per Noncompliance |
|---|---|
| Each Occurrence | $50,000 |

e.    for any failure to submit timely or adequate deliverables, with no material defects, required under Section 8 (Schedules) of the SOW and specified in this subparagraph:

| Period of Noncompliance | Penalty Per Noncompliance Per Day |
|---|---|
| 1st through 14th day | $3,000 |
| 15th through 30th day | $7,500 |
| 31st day and beyond | $12,000 |

  i.    Final (100%) Remedial Design for the Central NHOU Extraction and Treatment System;

  ii.    Construction Completion Report for the Central NHOU Extraction and Treatment System;

  iii.    Site-Wide Monitoring Plan;

  iv.    Central NHOU Monitoring and Progress Report; and

  v.    Containment Evaluation Technical Memo.

---

[2] This stipulated penalty may be assessed no more than once per thirty days.

59

f. for any failure to submit timely or adequate deliverables, with no material defects, required by this Decree and the SOW, other than those specified in ¶ 108.e:

| Period of Noncompliance | Penalty Per Noncompliance Per Day |
|---|---|
| 1st through 14th day | $750 |
| 15th through 30th day | $2,500 |
| 31st day and beyond | $7,500 |

109. **Work Takeover Penalty**. If EPA commences a Work Takeover, Settling Work Defendant shall be liable for a stipulated penalty in the amount of $3,500,000. This stipulated penalty is in addition to the remedy available to EPA under ¶ 76 (Access to Financial Assurance) to fund the performance of the Work by EPA.

110. **Accrual of Penalties**. Stipulated penalties accrue from the date performance is due, or the day a noncompliance occurs, whichever is applicable, until the date the requirement is completed or the final day of the correction of the noncompliance. For situations where the non-compliance involves failure to meet Performance Standards at the effluent, the first day of noncompliance will be the date sample results showing the exceedance of Performance Standards are received by Work Entities and the final day of noncompliance will be the date a sample is taken that demonstrates a return to compliance with Performance Standards. Days when the CNETS has not delivered water to the LADWP distribution system shall be excluded from the calculation of stipulated penalties for noncompliance with Performance Standards. Nothing in this Decree prevents the simultaneous accrual of separate penalties for separate noncompliances with this Decree. Stipulated penalties accrue regardless of whether Settling Defendants have been notified of their noncompliance, and regardless of whether Settling Defendants have initiated

dispute resolution under Section XIV, provided, however, that no penalties will accrue as follows:

      a.    with respect to a submission that EPA subsequently determines is deficient under Section 7.6 of the SOW, during the period, if any, beginning on the 31st day after EPA's receipt of such submission until the date that EPA notifies Settling Defendants of any deficiency;

      b.    with respect to a matter that is the subject of dispute resolution under Section XIV, during the period, if any, beginning on the 21st day after the later of the date that EPA's Statement of Position is received or the date that Settling Defendants' reply thereto (if any) is received until the date of the Formal Decision under ¶ 102.b; or

      c.    with respect to a matter that is the subject of judicial review by the Court under ¶ 103, during the period, if any, beginning on the 31st day after the Court's receipt of the final submission regarding the dispute until the date that the Court issues a final decision regarding such dispute.

    111.  **Demand and Payment of Stipulated Penalties**. EPA or DTSC may send Settling Defendants a demand for stipulated penalties. The demand will include a description of the noncompliance and will specify the amount of the stipulated penalties owed. Settling Defendants may initiate dispute resolution under Section XIV within 30 days after receipt of the demand. Settling Defendants shall pay the amount demanded or, if they initiate dispute resolution, the uncontested portion of the amount demanded, within 30 days after receipt of the demand. Settling Defendants shall pay the contested portion of the penalties determined to be owed, if any, within 30 days after the resolution of the dispute. Each payment for: (a) the uncontested penalty demand or uncontested portion, if late; and (b) the contested portion of the penalty demand determined to be owed, if any, must include an additional amount for Interest accrued from the date of receipt of the demand through the date of payment. Settling Defendants shall make

payment at https://www.pay.gov using the link for "EPA Miscellaneous Payments
Cincinnati Finance Center," including references to the Site/Spill ID and DJ
numbers listed in ¶ 134, and the purpose of the payment. Settling Defendants shall
send a notice of this payment to DOJ and EPA. The payment of stipulated penalties
and Interest, if any, does not alter any obligation by Settling Defendants under the
Decree.

112.    Nothing in this Decree limits the authority of the United States or the
State: (a) to seek any remedy otherwise provided by law for Settling Defendants'
failure to pay stipulated penalties or interest; or (b) to seek any other remedies or
sanctions available by virtue of Settling Defendants' noncompliances with this
Decree or of the statutes and regulations upon which it is based, including penalties
under section 122(*l*) of CERCLA, provided, however, that the United States may
not seek civil penalties under section 122(*l*) of CERCLA for any noncompliance
for which a stipulated penalty is provided for in this Decree, except in the case of a
willful noncompliance with this Decree.

113.    Notwithstanding any other provision of this Section, the United States
may, in its unreviewable discretion, waive any portion of stipulated penalties that
have accrued under this Decree.

## XVI.  COVENANTS BY PLAINTIFFS

114.    **Covenants for Settling Defendants**.

a.      Subject to ¶ 117 (General Reservations), the United States
covenants not to sue or to take administrative action against Settling Defendants
under sections 106 and 107(a) of CERCLA, or section 7003 of RCRA regarding
the Work, Past Response Costs through September 30, 2019, Past Basin-Wide
Costs through September 30, 2019, Future Response Costs, and Future Basin-Wide
Costs.

b.      Subject to ¶ 117 (General Reservations), DTSC covenants not
to sue or to take administrative action against Settling Defendants under

sections 106 and 107(a) of CERCLA, section 7003 of RCRA, or California Health and Safety Code sections 79055, 78870, 78660, or 79650 regarding the Work, DTSC Past Response Costs, and DTSC Future Response Costs.

115.    The covenants under ¶ 114: (a) take effect upon the Effective Date; (b) are conditioned on the satisfactory performance by Settling Defendants of the requirements of this Decree; (c) extend to the successors of each Settling Defendant but only to the extent that the alleged liability of the successor of the Settling Defendant is based solely on its status as a successor of the Settling Defendant; and (d) do not extend to any other person. Subject to the foregoing requirements and limitations, as to Settling Defendants that are added to this Decree after the Effective Date, these covenants shall take effect upon the date that the Court enters the modification adding them as Settling Cash Defendants.

116.    The United States may modify this Decree after its Effective Date by adding Settling Defendants.

117.    **General Reservations**. Notwithstanding any other provision of this Decree, the United States and DTSC reserve, and this Decree is without prejudice to, all rights against Settling Defendants regarding the following:

a.    liability for failure by Settling Defendants to meet a requirement of this Decree;

b.    liability arising from the past, present, or future disposal, release, or threat of release of Waste Material outside of the Central NHOU Area;

c.    liability based on Settling Defendants' ownership of any real property or facility within the NHOU when such ownership commences after Settling Defendants' signature of this Decree;

d.    liability based on Settling Defendants' operation of any facility within the NHOU when such operation commences after Settling Defendants'

signature of this Decree and does not arise solely from Settling Defendants' performance of the Work;

       e.    liability based on Settling Defendants' transportation, treatment, storage, or disposal, or arrangement for transportation, treatment, storage, or disposal of Waste Material at or in connection with the Site, after signature of this Decree by Settling Defendants, other than as provided in the Record of Decision, under this Decree, or ordered by EPA;

       f.    liability for completion of the Work, for Future Response Costs, and for Future Basin-Wide Costs in the event EPA commences a Work Takeover or determines that Settling Work Defendant cannot complete the Work, and EPA determines that the financial assurance under ¶ 71 remaining at the time of such commencement or determination is not sufficient to cover the costs of completing the Work;

       g.    liability for future response costs incurred by the United States as part of the Basin-Wide Remedial Investigation that are not included in the definition of Basin-Wide Remedial Investigation Costs;

       h.    in the event of bankruptcy or dissolution of a party obligated to pay Future Basin-Wide Costs under an administrative agreement, consent decree, and/or final judgment, liability for Future Basin-Wide Costs owed by such party;

       i.    for additional operable units at the Area 1 Site, future interim response actions at the Area 1 Site, or the final response action for the Area 1 Site;

       j.    liability, prior to completion of the Work, for additional response actions that EPA determines are necessary to achieve and maintain RAOs or to carry out and maintain the effectiveness of the NHOU2IR, but that are not covered by ¶ 62.b or ¶ 62.c;

       k.    liability for damages for injury to, destruction of, or loss of natural resources, and for the costs of any natural resource damage assessments; and

64

l.      criminal liability.

118.    Subject to ¶ 114, nothing in this Decree limits any authority of Plaintiffs to take, direct, or order all appropriate action to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release of Waste Material on, at, or from the NHOU, or to request a Court to order such action.

## XVII. COVENANTS BY SETTLING DEFENDANTS

119.    **Covenants by Settling Defendant**s

a.      Subject to ¶ 120, Settling Defendants covenant not to sue and shall not assert any claim or cause of action against the United States or the State under CERCLA, section 7002(a) of RCRA, the United States Constitution, the Tucker Act, 28 U.S.C. § 1491, the Equal Access to Justice Act, 28 U.S.C. § 2412, the State Constitution, State law, or at common law regarding the Work, past response actions relating to the Site, Past Response Costs, Past Basin-Wide Costs, Future Response Costs, and Future Basin-Wide Costs.

b.      Subject to ¶ 120, Settling Defendants covenant not to seek reimbursement from the Fund through CERCLA or any other law for costs of the Work and past response actions regarding the Site, Past Response Costs, Past Basin-Wide Costs, Future Response Costs, Future Basin-Wide Costs, DTSC Past Response Costs, and DTSC Future Response Costs.

120.    **Settling Defendants' Reservation**. The covenants in ¶ 119 do not apply to any claim or cause of action brought, or order issued, after the Effective Date by the United States or the State to the extent such claim, cause of action, or order is within the scope of a reservation under ¶¶ 117.a through 117.k.

121.    *De Minimis*/**Ability to Pay Waiver.** Settling Defendants shall not assert any claims and waive all claims or causes of action (including claims or causes of action under sections 107(a) and 113 of CERCLA) that they may have against any third party who enters or has entered into a *de minimis* or "ability-to-

pay" settlement with EPA to the extent Settling Defendants' claims and causes of action are within the scope of the matters addressed in the third party's settlement with EPA, provided, however, that this waiver does not apply if the third party asserts a claim or cause of action regarding the Site against the Settling Defendants. Nothing in the Decree limits Settling Defendants' rights under section 122(d)(2) of CERCLA to comment on any *de minimis* or ability-to-pay settlement proposed by EPA.

122. **Settling Defendants' Release and Covenant Not to Sue**. Each Settling Defendant releases and covenants not to sue each other Settling Defendant, pursuant to sections 107(a) or 113 of CERCLA, 42 U.S.C. §§ 9607(a) and 9613, section 7002 of RCRA, 42 U.S.C. § 6972, or any other federal or state statute or common law with respect to all claims of any kind, known and unknown, against other Settling Defendants that are within the scope of the contribution protection provided under ¶ 123 of this Decree. This covenant shall take effect upon the Effective Date, for those Settling Defendants who have already signed this Decree as of that date. As to any Settling Defendants who join this Decree after the Effective Date, this covenant shall take effect when the Court approves a modification to the Decree adding them as Settling Defendants. This covenant is conditioned upon the satisfactory performance by Settling Defendants of their obligations under this Decree.

## XVIII.   EFFECT OF SETTLEMENT; CONTRIBUTION

123. The Parties agree and the Court finds that the complaint filed by the United States in this action is a civil action within the meaning of section 113(f)(1) of CERCLA. Further, the Parties agree and the Court finds that as to Settling Defendants that are signatories to this Decree as of the Effective Date: (a) this Decree constitutes a judicially approved settlement under which each Settling Defendant has, as of the Effective Date, resolved its liability to the United States within the meaning of sections 113(f)(2) and 113(f)(3)(B) of CERCLA; and

66

(b) each Settling Defendant is entitled, as of the Effective Date, to protection from contribution actions or claims as provided by section 113(f)(2) of CERCLA, or as may be otherwise provided by law, for the "Matters Addressed" in this Decree. As to Settling Defendants that are added to the Decree after the Effective Date: (a) the modification adding such Settling Defendant to the Decree constitutes a judicially approved settlement under which each Settling Defendant has, as of the date of the Court's entry of the modification, resolved its liability to the United States within the meaning of sections 113(f)(2) and 113(f)(3)(B) of CERCLA; and

(b) each Settling Defendant is entitled, as of the date of the Court's entry of the modification, to protection from contribution actions or claims as provided by section 113(f)(2) of CERCLA, or as may be otherwise provided by law, for the "Matters Addressed" in this Decree. The "Matters Addressed" in this Decree are the Work, Past Response Costs, DTSC Past Response Costs, Past Basin-Wide Costs, Future Response Costs, DTSC Future Response Costs, and Future Basin-Wide Costs, provided, however, that if the United States exercises rights under the reservations in ¶¶ 117.a through 117.k, the Matters Addressed in this Decree will no longer include those response costs or response actions or natural resource damages that are within the scope of the exercised reservation.

124.   Each Settling Defendant shall, with respect to any suit or claim brought by it for matters related to this Decree, notify DOJ and EPA and the State no later than 60 days prior to the initiation of such suit or claim. Each Settling Defendant shall, with respect to any suit or claim brought against it for matters related to this Decree, notify DOJ and EPA and the State within 10 days after service of the complaint on such Settling Defendant. In addition, each Settling Defendant shall notify DOJ and EPA and the State within 10 days after service or receipt of any Motion for Summary Judgment and within 10 days after receipt of any order from a court setting a case for trial.

125.   **Res Judicata and Other Defenses**. In any subsequent administrative or judicial proceeding initiated against any Settling Defendant by either Plaintiff for injunctive relief, recovery of response costs, or other appropriate relief relating to the Site, Settling Defendants shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, claim preclusion (res judicata), issue preclusion (collateral estoppel), claim-splitting, or other defenses based upon any contention that the claims raised by the United States or the State in the subsequent proceeding were or should have been brought in the instant case.

126.   Nothing in this Decree diminishes the right of the U.S. or the State under section 113(f)(2) and (3) of CERCLA to pursue any person not a party to this Decree to obtain additional response costs or response action and to enter into settlements that give rise to contribution protection pursuant to section 113(f)(2).

## XIX.  RECORDS

127.   **Settling Defendant Certification**. Each Settling Defendant certifies individually that: (a) to the best of its knowledge and belief, after thorough inquiry it has not altered, mutilated, discarded, destroyed or otherwise disposed of any documents and electronically stored information relating to the Area 1 Site, including information relating to its potential liability under CERCLA regarding the Area 1 Site, since the earlier of notification of potential liability by the United States or the State or the filing of suit against it regarding the Area 1 Site; and (b) it has fully complied with any and all EPA and State requests for information under sections 104(e) and 122(e) of CERCLA, and section 3007 of RCRA, and State law.

128.   **Retention of Records and Information**

a.   Settling Defendants shall retain, and instruct their contractors and agents to retain, the following documents and electronically stored data ("Records") until 10 years after the Certification of Completion of the Work under SOW Section 5.11 (the "Record Retention Period"):

(1)     All records regarding Settling Defendants' liability under CERCLA regarding the Area 1 Site;

(2)     All reports, plans, permits, and documents submitted to EPA in accordance with this Decree, including all underlying research and data;

(3)     All data developed by, or on behalf of, Settling Defendants in the course of implementing the NHOU2IR; and

(4)     All Records regarding the liability of any person under CERCLA regarding the Site.

b.     At the end of the Record Retention Period, Settling Defendants shall notify EPA that it has 90 days to request the Settling Defendants' Records subject to this Section. Settling Defendants shall retain and preserve their Records subject to this Section until 90 days after EPA's receipt of the notice. These record retention requirements apply regardless of any corporate record retention policy.

129.   Settling Defendants shall provide to EPA and the State, upon request, copies of all Records and information required to be retained under this Section. Settling Defendants shall also make available to EPA and the State, for purposes of investigation, information gathering, or testimony, their employees, agents, or representatives with knowledge of relevant facts concerning the performance of the Work.

130.   **Privileged and Protected Claims**

a.     Settling Defendants may assert that all or part of a record requested by Plaintiffs is privileged or protected as provided under federal law, in lieu of providing the record, provided that Settling Defendants comply with ¶ 130.b, and except as provided in ¶ 130.c.

b.     If Settling Defendants assert a claim of privilege or protection, they shall provide Plaintiffs with the following information regarding such record: its title; its date; the name, title, affiliation (e.g., company or firm), and address of

69

the author, of each addressee, and of each recipient; a description of the record's contents; and the privilege or protection asserted. If a claim of privilege or protection applies only to a portion of a record, Settling Defendants shall provide the record to Plaintiffs in redacted form to mask the privileged or protected portion only. Settling Defendants shall retain all records that they claim to be privileged or protected until Plaintiffs have had a reasonable opportunity to dispute the privilege or protection claim and any such dispute has been resolved in Settling Defendants' favor.

   c. Settling Defendants shall not make any claim of privilege or protection regarding: (1) any data regarding the Area 1 Site, including all sampling, analytical, monitoring, hydrogeologic, scientific, chemical, radiological or engineering data, or the portion of any other record that evidences conditions at or around the Area 1 Site; or (2) the portion of any record that Settling Defendants are required to create or generate in accordance with this Decree.

  131. **Confidential Business Information ("CBI") Claims**. Settling Defendants may claim that all or part of a record provided to Plaintiffs under this Section is CBI to the extent permitted by and in accordance with section 104(e)(7) of CERCLA and 40 C.F.R. § 2.203(b). Settling Defendants shall segregate and shall clearly identify all records or parts thereof submitted under this Decree for which they claim CBI by labeling each page or each electronic file "claimed as confidential business information" or "claimed as CBI." Records that Settling Defendants claim to be CBI will be afforded the protection specified in 40 C.F.R. part 2, subpart B. If no CBI claim accompanies records when they are submitted to EPA and the State, or if EPA notifies Settling Defendants that the records are not entitled to confidential treatment under the standards of section 104(e)(7) of CERCLA or 40 C.F.R. part 2, subpart B, the public may be given access to such records without further notice to Settling Defendants.

132.   In any proceeding under this Decree, validated sampling or monitoring data generated in accordance with the SOW and reviewed and approved by EPA, if relevant to the proceeding, is admissible as evidence, without objection.

133.   Notwithstanding any provision of this Decree, Plaintiffs retain all of their information gathering and inspection authorities and rights, including enforcement actions related thereto, under CERCLA, RCRA, and any other applicable statutes or regulations.

## XX.   NOTICES AND SUBMISSIONS

134.   All agreements, approvals, consents, deliverables, modifications, notices, notifications, objections, proposals, reports, waivers, and requests specified in this Decree must be in writing unless otherwise specified. Whenever a notice is required to be given or a report or other document is required to be sent by one Party to another under this Decree, it must be sent as specified below. All notices under this Section are effective upon receipt, unless otherwise specified. In the case of emailed notices, there is a rebuttable presumption that such notices are received on the same day that they are sent. Any Party may change the method, person, or address applicable to it by providing notice of such change to all Parties.

As to DOJ:   *via email to*:

eescdcopy.enrd@usdoj.gov

Re: DJ # 90-11-3-1149/2

As to EPA:   *via email to*:

montgomery.michael@epa.gov

and

cruz.amanda@epa.gov

Re: Site/Spill ID # 09N1

71

| | | |
|---|---|---|
| As to the | *via email to*: | |
| Regional | ortesi.marie@epa.gov | |
| Financial | Re: Site/Spill ID # 09N1 | |
| Management | | |
| Officer: | | |
| As to the State: | *via email to:* | |
| | Laura.Radke@dtsc.ca.gov | |
| As to Settling | *via email to:* michael.heitmann@honeywell.com | |
| Work | *with copy to:* john.heintz@lw.com | |
| Defendant: | | |
| As to Home | *via email to:* | |
| Depot: | Jessica.Borgert@homedepot.com | |
| As to Kaiser: | *via email to:* Fernando.Avila@kp.org | |
| | *with copy to:* jcermak@cermaklegal.com | |
| As to Public | *via email to:* RealEstateLegal@publicstorage.com | |
| Storage: | *with copy to:* Dpalmer@allenmatkins.com | |
| As to Settling | *See* Appendix C | |
| Defendants | | |
| added to the | | |
| Decree after the | | |
| Effective Date: | | |

72

## XXI.  APPENDIXES

135.   The following appendixes are attached to and incorporated into this Decree:

"Appendix A" is the 2009 ROD, 2014 RODA, 2016 Memo to File, and 2018 ESD.

"Appendix B" is the SOW.

"Appendix C" is the list of Settling Defendants.

"Appendix D" is the Honeywell/LADWP License Agreement.

"Appendix E" is the Honeywell/LADWP Settlement Agreement.

"Appendix F" is Figures 1 – 9.

## XXII. MODIFICATIONS TO DECREE

136.   Except as provided in ¶ 62 of the Decree and Section 7.6 of the SOW (Approval of Deliverables), nonmaterial modifications to Sections I through XXVI and the Appendixes must be in writing and are effective when signed (which may include electronically signed) by the United States and Settling Work Defendant. Material modifications to Sections I through XXVI and the Appendixes, other than the addition of Settling Defendants to the Decree, must be in writing, signed (which may include electronically signed) by the United States, DTSC, and Settling Work Defendant, and are effective upon approval by the Court. Modifications to the Decree to add Settling Defendants as signatories to the Decree must be in writing and signed by the United States, are subject to public notice and comment consistent with Paragraph 139, and are effective upon approval by the Court. As to changes to the remedy, a modification to the Decree, including the SOW, to implement an amendment to the Record of Decision that "fundamentally alters the basic features" of the Remedial Action within the meaning of 40 C.F.R. § 300.435(c)(2)(ii) will be considered a material modification.

## XXIII.        SIGNATORIES

137.    The undersigned representative of the United States, the undersigned representative of the State, and each undersigned representative of a Settling Defendant certifies that he or she is fully authorized to enter into the terms and conditions of this Decree and to execute and legally bind such Party to this document.

## XXIV.        PRE-ENTRY PROVISIONS

138.    If for any reason the Court should decline to approve this Decree in the form presented, this agreement, except for ¶ 139 and ¶ 140, is voidable at the sole discretion of any Party and its terms may not be used as evidence in any litigation between the Parties.

139.    This Decree will be lodged with the Court for at least 30 days for public notice and comment in accordance with section 122(d)(2) of CERCLA and 28 C.F.R. § 50.7. The United States may withdraw or withhold its consent if the comments regarding the Decree disclose facts or considerations that indicate that the Decree is inappropriate, improper, or inadequate.

140.    Settling Defendants agree not oppose or appeal the entry of this Decree.

## XXV. INTEGRATION

141.    This Decree constitutes the entire agreement among the Parties regarding the subject matter of the Decree and supersedes all prior representations, agreements, and understandings, whether oral or written, regarding the subject matter of the Decree.

74

1

2

## XXVI.    FINAL JUDGMENT

3

     142.   Upon entry of this Decree by the Court, this Decree constitutes a final

4

judgment under Fed. R. Civ. P. 54 and 58 among the Parties.

5

SO **ORDERED** this 12th day of February 2025.

6

                                  _____

7

                                    Mark C. Scarsi

8

                                    United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  Signature Page for Consent Decree in *United States and DTSC v. Honeywell*
2  *International Inc., et al.* (C.D. Cal.)

3

4  **FOR THE UNITED STATES:**

5

6  Todd Kim
7  Assistant Attorney General
8  U.S. Department of Justice
   Environment and Natural Resources
9  Division

10

11  _____
12  Angela Mo
   Senior Counsel
13  U.S. Department of Justice
14  Environment and Natural Resources
   Division
15  Environmental Enforcement Section
16  4 Constitution Square, 150 M Street,
   N.E., Room 2.900, Washington, D.C.
17  20002

18

19

20

21

22

23

24

25

26

27

28

1  Signature Page for Consent Decree in *United States and DTSC v. Honeywell*
2  *International Inc., et al.* (C.D. Cal.)

3

4                              **FOR THE U.S.**
                               **ENVIRONMENTAL**
5                              **PROTECTION AGENCY:**

6

7

8       _____
        Michael Montgomery
9       Director, Superfund and Emergency
        Management Division
10      U.S. Environmental Protection
        Agency
11      Region IX

12

13

14      _____
        Suzanne Andrews
15      Acting Regional Counsel
        U.S. Environmental Protection
16      Agency
        Region IX
17

18

19

20      _____
        Michael Massey
21      Assistant Regional Counsel
        U.S. Environmental Protection
22      Agency
        Region IX
23      75 Hawthorne Street
        San Francisco, California 94105
24

25

26

27

28

                              77

Signature Page for Consent Decree in *United States and DTSC v. Honeywell International Inc., et al.* (C.D. Cal.)

FOR:  **PLAINTIFFS THE CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL AND THE TOXIC SUBSTANCES CONTROL ACCOUNT:**

Dated                      Name:  _____
                           Title:
                           Address:

78

Signature Page for Consent Decree in *United States and DTSC v. Honeywell International Inc., et al.* (C.D. Cal.)

**FOR**:  **HONEYWELL INTERNATIONAL INC.**

_____
Dated

Name:  Benny Dehghi
Title:  Vice President, Global Remediation and Site Redevelopment
Address:  855 S. Mint St., Charlotte, NC 28202

If the Decree is not approved by the Court within 60 days after the date of lodging, and the United States requests, this Settling Defendant agrees to accept service of the complaint by mail, and to execute a waiver of service of a summons under Rule 4 of the Federal Rules of Civil Procedure and any applicable local rules of this Court. **This Settling Defendant hereby designates the agent below to accept service of the complaint by mail and to execute the Rule 4 waiver of service.** This Settling Defendant understands that it does not need to file an answer to the complaint until it has executed the waiver of service or otherwise has been served with the complaint.

Name:  John C. Heintz
Title:  Partner
Company:  Latham & Watkins LLP
Address:  355 S. Grand Ave
Ste. 100
Phone:  213-891-7395
email:  john.heintz@lw.com

79

Signature Page for Consent Decree in *United States and DTSC v. Honeywell
International Inc., et al.* (C.D. Cal.)

FOR: **HD DEVELOPMENT OF
        MARYLAND, INC.**


_____          _____
Dated            Name:    Jessica Borgert
                 Title:   Assistant General Counsel, The Home
                          Depot
                 Address: 2455 Paces Ferry Road, Bldg. C-20
                          Atlanta, GA 30339-4024


   If the Decree is not approved by the Court within 60 days after the date of
lodging, and the United States requests, this Settling Defendant agrees to accept
service of the complaint by mail, and to execute a waiver of service of a summons
under Rule 4 of the Federal Rules of Civil Procedure and any applicable local rules
of this Court. **This Settling Defendant hereby designates the agent below to
accept service of the complaint by mail and to execute the Rule 4 waiver of
service.** This Settling Defendant understands that it does not need to file an answer
to the complaint until it has executed the waiver of service or otherwise has been
served with the complaint.


        Name:    Cordon T. Baesel
        Title:   Counsel
      Company:   Troutman Pepper Hamilton Sanders
                 LLP
      Address:   11682 El Camino Real, Suite 400
                 San Diego, CA 92130
        Phone:   858-509-6079
        email:   Cordon.baesel@troutman.com

80

Signature Page for Consent Decree in *United States and DTSC v. Honeywell International Inc., et al.* (C.D. Cal.)

**FOR: KAISER FOUNDATION HEALTH PLAN, INC.**

—————
Dated          Name:
                   Title:
                   Address:

        If the Decree is not approved by the Court within 60 days after the date of lodging, and the United States requests, this Settling Defendant agrees to accept service of the complaint by mail, and to execute a waiver of service of a summons under Rule 4 of the Federal Rules of Civil Procedure and any applicable local rules of this Court. **This Settling Defendant hereby designates the agent below to accept service of the complaint by mail and to execute the Rule 4 waiver of service.** This Settling Defendant understands that it does not need to file an answer to the complaint until it has executed the waiver of service or otherwise has been served with the complaint.

|              |                             |
|-------------:|-----------------------------|
| Name:        | John F. Cermak Jr.          |
| Title:       | Partner                     |
| Company:     | Cermak & Inglin, LLP        |
| Address:     | 12121 Wilshire Blvd., Suite 322 |
|              | Los Angeles, CA 90025       |
| Phone:       | (424) 465-1531              |
| email:       | jcermak@cermaklegal.com     |

81

Signature Page for Consent Decree in Signature Page for Consent Decree in *United States and DTSC v. Honeywell International Inc., et al*. (C.D. Cal.)


FOR:    **PSA Institutional Partners, L.P.**

By:    PS LPT Properties Investors
a Maryland real estate investment trust

Its:    General Partner


_____

Dated        Name:    Sharon Linder
Title:    Vice President
Address:    701 Western Avenue
Glendale, CA 91210

If the Decree is not approved by the Court within 60 days after the date of lodging, and the United States requests, this Settling Defendant agrees to accept service of the complaint by mail, and to execute a waiver of service of a summons under Rule 4 of the Federal Rules of Civil Procedure and any applicable local rules of this Court. **This Settling Defendant hereby designates the agent below to accept service of the complaint by mail and to execute the Rule 4 waiver of service.** This Settling Defendant understands that it does not need to file an answer to the complaint until it has executed the waiver of service or otherwise has been served with the complaint.


Name:    Dana P. Palmer, Esq.
Title:    Partner
Company:    Allen Matkins Leck Gamble Mallory & Natsis LLP
Address:    1901 Avenue of the Stars, Suite 1800, Los Angeles, CA 90067
Phone:    (310) 788-2444
email:    dpalmer@allenmatkins.com

82

1

2

3    **Appendix A**

4    **2009 ROD, 2014 RODA, 2016 Memo to File, and 2018 ESD**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Appendix B**

**Statement of Work**

1

**Appendix C**

**List of Settling Defendants**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Appendix D**

**Honeywell/LADWP License Agreement**

1
2                                    **Appendix E**
3                      **Honeywell/LADWP Settlement Agreement**
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Appendix F**

**Consent Decree Figures 1 - 9**